ORIGINAL

2018 NOV -6 AM II: 20

FILED

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, *et al.,*
*ex rel.* [Under Seal]

      Plaintiffs,

      v.

[Under Seal],

      Defendants.

Case No. CV18-09426-00PBIAx

**Filed Under Seal**
**Pursuant to 31 U.S.C. § 3730**

PAID

NOV - 6 2018

Clerk, US District Court
COURT 4612

- 1 -
QUI TAM COMPLAINT (FILED UNDER SEAL)

FILED

PAID

NOV - 6 2018

Clerk, US District Court
COURT 4612

2018 NOV -6  AM II: 08

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, *et al.,*
*ex rel.* [Under Seal]

          Plaintiffs,

      v.

[Under Seal],

          Defendants.

Case No. **CV 18 - 09426-DDP-PLAx**

**Filed Under Seal**
**Pursuant to 31 U.S.C. § 3730**

**ORIGINAL**

- 1 -

QUI TAM COMPLAINT (FILED UNDER SEAL)

**ROSMAN & GERMAIN LLP**
Daniel L. Germain (Cal. Bar No. 143334)
16311 Ventura Boulevard
Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: Germain@Lalawyer.com

[Additional counsel listed on signature block]

Attorneys for Relator Richard Mark

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the Commonwealth of MASSACHUSETTS, VIRGINIA, and the DISTRICT OF COLUMBIA, *ex rel.* RICHARD MARK, <br><br> Plaintiffs, <br><br> v. <br><br> SHAMIR USA, INC., SHAMIR OPTICAL INDUSTRY, LTD., SHAMIR OPTICA HOLDINGS A.C.S. LTD. and SHAMIR INSIGHT, INC., <br><br> Defendants. | Case No.: <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** <br><br> **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** <br><br> **QUI TAM COMPLAINT** <br><br> **[DEMAND FOR JURY TRIAL]** |

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**

- 2 -

The United States of America (the "Government") and the Plaintiff States (defined below) (the United States and the Plaintiff States are collectively referred to herein as the "Government"), by and through *qui tam* Relator, Richard Mark ("Relator"), bring this action under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or "FCA") and the false claims acts of the respective Plaintiff States against Shamir USA, Inc., Shamir Optical Industry, Ltd., Shamir Optica Holdings A.C.S. Ltd. and Shamir Insight, Inc. (collectively, "Shamir" or "Defendants" or "Company") to recover all damages, penalties, and other remedies provided by the FCA, and analogous state statutes,[1] and for his complaint ("Complaint") alleges:

1. Based on the Relator's personal knowledge and further investigation, sufficient evidence exists to allege that Defendants have violated and continue to violate the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and Anti-Kickback Statute

---

[1] Specific citations for relevant state *qui tam* statutes are as follows: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*; Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; Illinois False Claims Act, 740 ILCS 175/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; Iowa False Claims Law, I.C.A. § 685.1 *et seq.*; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*; Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*; Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*; Montana False Claims Act, MCA § 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*; New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*; Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*; Virginia Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; and District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

- 3 -

("Anti-Kickback Statute" or "AKS") by submitting fraudulent bills to the Government (and/or through their conduct in causing others to submit fraudulent bills to the Government) and private insurers as a result of kickbacks provided to eyecare professionals ("ECPs") and other optical purchasers.

2.    This is also an action to recover treble damages and civil penalties from Defendants for knowingly and/or recklessly presenting or causing to be presented false or fraudulent health care claims to the States of California and Illinois, and to presently unknown private insurance companies operating or insuring policyholders in those states, pursuant to the California Insurance Frauds Prevention Act ("CIPFA"), Cal. Ins. Code §§ 1871 *et seq.*, and the Illinois Claims Fraud Prevention Act ("ICFPA"), 740 I.L.C.S. §§ 92/1 *et seq.*

**PARTIES**

3.    Relator was Shamir's Key Account Manager for North America from February 2015 until December 2015, when his position was eliminated. Prior to joining Shamir, Relator spent 15 years in the optical industry. Relator was initially hired by Mark Becker, Shamir's Vice President of Marketing and Strategic Partnerships. Becker was responsible for all of Shamir's marketing, retail accounts, and Shamir's new laboratory initiative, InoTime. According to Relator, Becker felt stretched too thin and had worked with Relator in the past, so he offered him a position with Shamir managing its retail accounts.

4.    Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare").

5.    The Plaintiff States are the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York,

- 4 -
QUI TAM COMPLAINT (FILED UNDER SEAL)

North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, the Commonwealths of Massachusetts and Virginia, and the District of Columbia. They each bring claims for Defendants' violations of their respective state false claims acts, as set forth in detail in the Counts, below.

6. Founded in 1972, and headquartered in Kibbutz Shamir, Israel, Shamir is one of the world's leading manufacturers of high-quality progressive lenses, and is a global leader in the fast growing freeform lens technology sector.

7. Originally established as a manufacturer of bi-focal lenses, within a decade's time Shamir ranked among the world's top ten companies to develop and market original progressive lenses. Shamir developed software dedicated to the design of progressive lenses. This software is based on Shamir Optical's proprietary mathematical algorithms that optimize designs of progressive lenses for a variety of activities and environments. Shamir Optical also has created software tools specifically designed for research and development and production requirements, including its first technological breakthrough, EyePoint Technology software, developed in 1998, which simulates human vision

8. On October 15, 2010, Shamir Optical Industry Ltd., and Essilor International, announced that they signed an agreement whereby Essilor, through a series of transactions, acquired 50 percent of Shamir Optical. As a result of these transactions, Kibbutz Shamir and Essilor each own 50 percent of Shamir Optical. Essilor, based in Charenton-le-Pont, is the leading ophthalmic lens manufacturer worldwide. Under the terms of the agreements between Essilor and Kibbutz Shamir, approved by the District Court of Nazareth on June 13, 2011, the existing management team of Shamir Optical remained in place allowing Shamir Optical to continue to produce and promote its brands, products and services as a separate business entity. Upon completion of the merger, Essilor fully consolidated Shamir Optical and it was delisted from the Nasdaq Global Market and the Tel Aviv Stock Exchange. According to Amos Netzer, Shamir CEO, the merger strengthened

Shamir's presence in the market place by using Essilor's R&D capabilities, notably in coatings, and its worldwide distribution network.

9.    Shamir Insight, Inc., is a fully owned subsidiary of Shamir Optical Industry, Ltd., established in 1997 and headquartered in San Diego, CA. Shamir Insight is engaged in the development, design and manufacture of premium progressive lenses and molds for the ophthalmic industry.  Shamir Insight also manufactures Single-Vision lenses and Shamir Glacier Plus UV lens coating.

## JURISDICTION AND VENUE

10.    Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

11.    The Court may exercise personal jurisdiction over Defendants, and venue is proper in this Court, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 et seq., and complained of herein, took place in part in this District and Defendants transacted business in this District, as described herein.

12.    Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the Central District of California, as well as a statement of all material evidence and information currently in its possession and of which it is the original source.  These disclosure statements are supported by material evidence known to the Relator at the time of filing establishing the existence of Defendants' false claims. Because the statements include attorney-client communications and work product of Relator's attorneys and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relator understands these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act.  5 U.S.C. § 552; 31 U.S.C. § 3729(c).

QUI TAM COMPLAINT (FILED UNDER SEAL)

## BACKGROUND

### *The United States False Claim Act*

13.    The FCA provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

- 7 -

QUI TAM COMPLAINT (FILED UNDER SEAL)

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

14.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, Sec. 701, False Claims Act civil penalties were increased to a minimum of $10,781, and a maximum of $21,563, for violations occurring on or after November 2, 2015. *See also* 28 C.F.R. § 85.5.

15.    Significantly, the FCA imposes liability where the conduct is merely "in

- 8 -

QUI TAM COMPLAINT (FILED UNDER SEAL)

reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1).

### *The California and Illinois Insurance Fraud Prevention Acts*

16.    While the federal and state FCA statutes protect *public* insurance entities from fraud, California and Illinois are unique in permitting whistleblowers to bring a *qui tam* action against any person or company that defrauds private insurance companies and share in the recovery. *See* CIPFA, Cal. Ins. Code §§ 1871 *et seq.*; ICFPA, 740 I.L.C.S §§ 92/1 *et seq.*

17.    Rather than bringing the case on behalf of the government and fellow taxpayers, a CIPFA or ICFPA Relator brings the case on behalf of the government *and* the relevant private insurance companies' policyholders.

### *The Anti-Kickback Statute*

18.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A) and (B), prohibits offering to pay or paying any remuneration (including any kickback, bribe, or rebate) to any person to induce such person "to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program" or "to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program" *Id.*

19.    Pursuant to the Anti-Kickback Statute, it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product or service (including optical lenses) for which payment is sought from any federally-funded health care program, including Medicare, Medicaid and TriCare. The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985), *cert denied*, 474 U.S. 988 (1985).  In order to ensure compliance, every federally-funded health care program requires every provider or supplier to ensure

compliance with the provisions of the Anti-Kickback Statute and other federal laws governing the provision of health care services in the United States.

20.    A violation of the Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under the Anti-Kickback Statute must be excluded from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(b). The government may also assess civil money penalties, which could result in treble damages plus $50,000 for each violation of the Anti-Kickback Statute. 42 U.S.C § 1320a-7a(a)(7).

21.    Importantly, although the Anti-Kickback Statute does not afford a private right of action, the False Claims Act provides a vehicle whereby individuals may bring *qui tam* actions alleging violations of the Anti-Kickback Statute. *See* 31 U.S.C. §§ 3729-3733.

22.    Compliance with the Anti-Kickback Statute is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA.  42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the FCA]. . . ."); *see also United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 315 (3d Cir. 2011) (stating "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare" and holding that "appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA.").

23.    Compliance with the AKS is a precondition to participation and payment as a health care provider under the Affordable Care Act, Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, FEHBP, MHBP, FEDVIP, and other federal health care programs. Moreover, numerous of the States have analogous anti-kickback statutes, making it illegal to offer any form of kickback to induce a

- 10 -

healthcare professional to use its products.

24.    The Anti-Kickback Statute was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the Anti-Kickback Statute are also a violation of the FCA. 42 U.S.C. § 1320a-7(b)(g). The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

## SUBSTANTIVE ALLEGATIONS

### I.    Overview of Medicare and Its Benefits

25.    Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

26.    The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS") administers the Medicare and Medicaid programs. CMS is authorized to enter into and administer contracts with insurance companies or Medicare contractors on behalf of HHS. Inclusive in CMS's contracting authority is the responsibility for entering into contracts with health care providers and suppliers.

27.    Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (usually 80 percent) of the fee schedule amount for physician and laboratory services, outpatient services and all other services not covered by Medicare Part A. Medicare Part B contractors process and pay claims for these services.

28.    Medicare Part B covers one pair of eye glasses or one set of contact lenses following each cataract surgery that implants an interocular lens. Additional charges for ultraviolet ("UV") protection are considered "reasonable and necessary" after interocular lens implantation and therefore are covered by Medicare Part B. On

the other hand, anti-reflective coatings, tints or oversized lenses are only covered when used by the treating physician, and impact resistant lenses are only covered where the patient has functional vision in only one eye. Medicare Part B does not generally cover prescription corrective lenses under other circumstances. In addition, a Medicare policyholder who opts for a Medicare Advantage plan may have access to routine eye exams (including pupil dilation), eyeglass frames and one pair of eyeglass lenses or contact lenses every twenty-four months. *See* CMS Medicare Vision Services Fact Sheet.

## II.   Overview of Medicaid and Its Benefits

29.   Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

30.   The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS. 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ." *See* 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation.

31.   As a prerequisite to participating in state Medicaid programs, providers must expressly certify (or, through their participation in the state-funded health care program, impliedly certify) their compliance with federal and state laws governing Medicaid, including the federal Anti-Kickback Statute

32.   Through the FMAP process, State Medicaid administrators obtain the

QUI TAM COMPLAINT (FILED UNDER SEAL)

Federal Government's share of the ECPs' reimbursements by submitting a quarterly Form 64 to CMS. For this reason, claims submitted to State Medicaid agencies are "presented" to the Federal Government within the meaning of the FCA.

33. The Federal Government also "approves" within the meaning of the FCA the claims submitted and paid through the Medicaid program. When a State presents its Form 64 (i.e., the quarterly report of actual expenditures) to CMS, the amounts of any fraudulent claims the State paid will be included in those reports. Based on the information in the reports, CMS determines and approves whether the claims that the State paid with federal funds were appropriate. If CMS determines that certain claims paid by the state were improper, CMS may recoup the amount of erroneously expended funds by reducing the amount of money provided to the State during the next quarter.

34. Because the Form 64 constitutes the United States' method for approving and paying the amount of federal funds expended by the State, Shamir's AKS violations resulted in these reports overstating the amount of federal funds which the State was entitled. They were, therefore, false records or statements that Shamir caused to be made or used to get false claims paid and approved by the United States.

35. The claims for reimbursement submitted by the ECPs and others to the States, which in turn caused the States to submit these claims for reimbursement to the Federal Government pursuant to FMAP, constituted false claims as a result of being tainted by illegal kickbacks, in violation of the AKS and FCA.

36. Whether, and to what extent, Medicaid covers optical lenses depends on the particular state's Medicaid benefits. As of 2012, 41 states and the District of Columbia covered optical lenses as part of the Medicaid benefit. The Medicaid program's benefit for children and adolescents is known as Early and Periodic Screening, Diagnostic and Treatment services ("EPSDT"). EPSDT provides a comprehensive array of prevention, diagnostic, and treatment services for low-

- 13 -

income infants, children and adolescents under age 21, as specified in Section 1905(r) of the Social Security Act. The EPSDT benefit is more robust than the Medicaid benefit for adults and is designed to assure that children receive early detection and care, so that health problems are averted or diagnosed and treated as early as possible.

37.    State Medicaid plans pay for optical lenses through several different payment methods. Some states use the traditional fee-for-service model. In such states, the Medicaid beneficiary visits the ECP and the ECP orders the glasses from an optical lab (*e.g.*, Shamir). The lab makes the eyeglasses, sends the finished eyewear back to the ECP, and the ECP bills the state using the applicable CPT V-Code. The ECP is reimbursed an established maximum payment amount or an established percentage of the maximum applicable to the Medicare program for the lenses. The state generally pays the lesser of the ECP's charge or this amount. V-Code reimbursement rates can be found on the state's Medicaid fee schedule.

38.    Other states use volume purchase or direct-to-state programs. Under these payment methods, the state contracts with one or more optical labs that either provides volume based discounted pricing for lenses to the state Medicaid plan for its recipients or provides discounted Fee For Service pricing according to an established fee schedule. The ECP may be required to order eyeglasses from the contracted optical lab(s) unless prior authorization is received for a lens that cannot be produced by the contracted vendor. The contracted lab(s) makes the eyeglasses, sends the finished eyewear back to the ECP, and either bills the state or the provider according to its contract with the state

## III.    Other Federal, State, and Municipal Programs

39.    In addition to reimbursing eyeglass lens and coatings purchases through Medicare, Medicaid, and other Federal health care programs, the United States, the States and the Municipalities paid significant amounts for Shamir products through various programs such as:

- CHAMPUS/TRICARE is a health care program administered by the Department of Defense for individuals and dependents affiliated with the armed forces.

- CHAMPVA is a health care program administered by the Department of Veterans Affairs for families of veterans with 100% service-connected disabilities.

- The Federal Employee Health Benefit Program ("FEHBP") and the Mail Handlers Health Benefit Program ("MHBP") provide health insurance for federal employees and mail handlers, retirees and survivors, including vision benefits.

- The Federal Employee Dental and Vision Insurance Program ("FEDVIP") provides supplemental dental and vision benefits to federal employees, retirees and their dependents.

- Each State and Municipality offers health benefits to its employees through various programs administered by the States and Municipalities, which include vision benefits.

- Each State offers various health benefits in its corrective institutions, state hospitals, and through various child health programs, including vision benefits.

40. Each of these programs (collectively along with Medicaid, Medicare and Tricare referred to herein as the "Government Healthcare Programs") offers vision benefits and has paid for Shamir's products tainted with kickbacks, as alleged herein.

41. Compliance with the AKS is a precondition to participation and payment as a healthcare provider under the Government Healthcare Programs. The United States and the States paid money to ECPs for Shamir products which were the result of Defendants' unlawful kickbacks. During the time period relevant to this Complaint, Shamir product claims from ECPs tainted by kickbacks submitted to Government Healthcare Programs were ineligible for reimbursement and therefore false as a matter of law.

**IV.   Defendants' Fraudulent Conduct**

42. Defendants have engaged in an unlawful kickback scheme whereby providers were directly offered unlawful economic inducements to induce ECPs and other purchasers, such as retail chains, optical buying groups and optical insurance providers, to purchase Shamir's products over its competitors' products. In many cases, the financial inducements offered by Shamir resulted in the ECP

- 15 -

recommending a more expensive lens or coating to their patient then was necessary in order to reap the associated financial benefits with this more expensive product. And, as discussed below, this extra cost was simply passed on to the insurance provider which in many cases was the state or federal government. This *quid pro quo* arrangement violates the Anti-Kickback Statute because it involves the provision of financial benefits in return for referrals of business, which resulted in reimbursement from federal health care programs.  As a result of this *quid pro quo* arrangement, claims for optical lenses and coatings, which were tainted by unlawful kickbacks, have been submitted to and paid by federal and state health care programs in violation of the FCA.

### A.    Background on Optical Lens Industry

43.    There are three levels in the optical lens distribution system. The top level consists of lens manufacturers such as Shamir. They manufacture and sell unfinished lens blanks. Blanks can be made of a variety of materials (plastic, glass, etc.) and are ground into finished lenses by the second level – laboratories. Manufacturers also sell treatments for the finished lenses such as anti-reflective ("AR") coatings.

44.    Laboratories – the middle tier – receive orders (prescriptions) from the dispensing (retail) level and, using blanks obtained from manufacturers, grind the blank into a finished lens to fit that prescription. They also apply AR coatings and other finishings, if ordered, to the finished lens.  The third level is the retail level, occupied by dispensing optometrists, ophthalmologists, and opticians. This level either issues (optometrists and ophthalmologists) or receives the prescription (opticians), and sends the prescription to the laboratory to have the prescription filled.

45.    Shamir partners with laboratories to manufacture its lenses. Shamir also sells its lens designs, which can be manufactured in any laboratory, separate from the blanks Shamir also sells. When a purchaser purchases a Shamir lens design, they pay Shamir a "click fee" for every Shamir design lens they manufacture.

QUI TAM COMPLAINT (FILED UNDER SEAL)

46.    Shamir also sells non-partner labs lenses from its "private catalog." Shamir's private catalog is a selection of unbranded Shamir lenses. When customers purchase this, they can manufacture the Shamir lens without the Shamir logo and branding.

47.    The patient's source of payment frequently dictates the operation of the chain of distribution in a given instance. For example, a VSP member will typically see an optometrist within VSP's network. The resulting prescription goes to a laboratory under contract with VSP. Often, that laboratory will also have ties to Shamir, almost ensuring that whatever the suitability of Shamir's lenses for the particular prescription, Shamir's lenses will be used.

**B.    Background on Insurance Programs Reimbursement for Optical Lenses**

48.    Both government and private insurance plans reimburse ECPs for lenses purchased for their patients. For most private optical insurance plans, the rates are based on either the expected or actual cost of the lenses. Upon information and belief, insurance plans use the "list" or "catalog" price to set the reimbursement rates for these lenses. In some instances, the private insurance plan does not cover the full cost of the patient's lenses. In such cases, the patient is responsible for paying the remaining cost, after insurance reimbursement, for the lens as a copay.

49.    Public insurance plans, including many Medicaid plans, reimburse based upon the invoice price. The term "invoice price" is also referred to as the "acquisition cost," "provider charge," "by report," "manually priced," or "individual consideration." Although some plans use different terms, all of these terms represent that the insurance plan reimburses based upon the actual price paid by the ECP. Indeed, many state Medicaid plans require the ECP to submit a copy of the invoice when seeking reimbursement for optical lenses.

50.    Specifically, the following state Medicaid programs reimburse based upon catalog/invoice price: Arizona, California, Colorado, Indiana, Iowa, Louisiana,

Massachusetts, Maryland, Michigan, Missouri, North Carolina, Nebraska, New Jersey, Nevada, New Mexico, New York, Ohio, Pennsylvania, Rhode Island, South Dakota, Virginia, West Virginia, Wyoming, and Georgia (Georgia reimburses based on invoice price, minus $20). Further, Kentucky, Ohio, New York, Connecticut, and Kansas also reimburse by invoice price under certain circumstances.

### C.    Shamir Pays Kickbacks to ECPs to Induce Them to Order Its Products Over Its Competitors Products

51.    Shamir pays kickbacks to ECPs and other purchasers to order its products over the products sold by its competitors. Shamir mainly provides kickbacks to ECPs through its ReCreating Perfect Vision ("RCPV") program and the RCPV Plus program.  Through the RCPV, Shamir induces ECPs and large optical buying groups to choose its lenses over its competitors' lenses by giving them cash, rebates, Discounts, expensive gifts, free products, and gift cards.  As discussed in more detail below, Shamir uses the RCPV as well as other valuable consideration in exchange for the purchaser's agreement to promote Shamir's more expensive lenses over their more basic, cost effective lenses.

### 1.    Shamir Induces ECPs and other Purchasers though its RCPV Program

52.    Shamir's RCPV and RCPV Plus are the main vehicles used to induce ECPs and other purchasers to select Shamir's lenses over its competitors. The RCPV program is simple: the RCPV assigns a set amount of reward points for each Shamir lens and coating as well as a cash rebate for each lens and coating. ECPs and other purchasers enroll in the program and accrue reward points and rebates for each Shamir lens they purchase. The reward points can be redeemed online for cash, gifts, or optical equipment. Shamir pays the rebates on a monthly basis via check.

53.    ECPs enroll in the RCPV program by submitting a W-9 form to Shamir and prescribing a minimum of 15 pairs of any Shamir lens in a calendar month. Shamir then sends the ECP a letter with the access codes needed to complete

- 18 -

registration. After the ECP or other purchaser is enrolled in the program, they receive a certain number of RCPV Reward Points for each Shamir lens or coating purchase. Shamir assigned a certain number of Reward Points to each lens or coating it sold. According to Relator, Shamir determines the number of points assigned to a particular lens depending on which lenses they want to sell. Typically, Shamir assigned the most reward points to its newer and more expensive lenses to encourage purchasers to order them. During Relator's time with Shamir, the sales focus was on the Autograph III ("AIII") lens and the Glacier Plus AR Coating. And, as of 2017, Shamir provided RCPV Reward Points for the following lenses: Autograph III, Attitude III-Fashion, Attitude III-Sport, Attitude III-SV, Computer, WorkSpace, Duo, Relax, Autograph II – Office, Office, Autograph II – Single Vision Attitude, Golf – Single Vision, Spectrum+, Spectrum, Golf, FirstPAL, Piccolo, Creation, Autograph II, InTouch, Attitude, Autograph II – Attitude, Element, Genesis, and Glacier Plus (AR). All of these lenses (and the Glacier coating) are considered Shamir "premier" lenses.

54.   Shamir started the program in 2002 under the name "Select Rewards" program, and in 2003 the program was revamped and renamed RCPV. From 2002 until 2009, RCPV Reward Points could only be redeemed for cash. In 2003, the RCPV provided ECPs with $12 for each pair of Shamir Piccolo or Genesis lens prescribed and $6 for each Office premium progressive lens prescribed. In 2007, Shamir added a $15 cash payment per pair of Attitude or Autograph lenses through RCPV, while still paying ECPs $6 for Office lenses and $12 for Creation, Piccolo, and Genesis lenses.

55.   In July 2009, Shamir revamped RCPV, adding a host of new products and gift cards ECPs could purchase with their Reward Points. Through the RVPC, after 2009, ECPs were able to receive gifts and products such as Apple products, houseware, electronics, optical products such as Pupilometers and Lensometers, personalized items, and gift cards from companies such as Visa, Target and Walmart.

Shamir also switched the RCPV over to a points-based system at this time. Prior to revamping RCPV, ECPs would only receive a set amount of cash for each Shamir lens or coating they purchased. After July 2009, Shamir attached a set number of RCPV Reward Points to each lens. When an ECP purchased that lens for patient, they would receive the associated number of Reward Points which could then be exchanged for cash, products or gift cards. Significantly, and as discussed below in more detail, when a Shamir lens was purchased, RCPV provided the purchaser both reward points, which could be redeemed for cash, as well as a cash rebate. Providers still had to sell 15 pairs of Shamir lenses in a month to be eligible to participate in the RCPV, as well as complete the other requirements discussed above.

56.    Examples of the points associated with Shamir lenses are as follows:

- In 2009, RCPV offered ECPs 10 points, 800 points, 1800 points, or 2250 points per pair of its lenses, depending on the pair.

- In 2012, Shamir added an incentive of 900 points per pair of its new freeform lens design, FirstPAL.

- In March 2013, Shamir announced the launch of its new freeform design, Autograph III, offering ECPs 2250 points for each pair of Autograph III lenses dispensed.

- In August 2013, Shamir released its InTouch lenses, offering ECPs 1500 points for each pair of InTouch lenses dispensed.

57.    Beginning in 2014, RCVP participants could receive, through their Reward Points, rewards of $20, $15, $12, $10 or $6 per pair of lenses purchased. The amount received depended on the lenses purchased. In addition, in August 2014, Shamir revamped the products ECPs could purchase through the RCPV. Such new products included: Apple iPod Touch, Apple MacBook Pro, Apple iPads, Apple iPad Mini, TVs, Blue-Ray Players, purses, kitchen appliances, Xbox 360, optical items such as Pupilometers and Lensometers, and personalized giveaways for their practice such as lens cleaners, frame pouches, and lens cleaning cloths.

58.    As time passed, the RCVP became more comprehensive, offering ECPs very expensive and lavish equipment and gifts. For example, in 2016, Shamir

- 20 -

QUI TAM COMPLAINT (FILED UNDER SEAL)

released its newest measurement device, the Spark MI. The Spark MI looks and acts like an ordinary tabletop mirror, but it is actually an advanced measuring device that allows ECPs to take all required measurements for clear and dark lenses in one click, saving the ECP time and guaranteeing precision. The Spark MI helps ECPs grow their practices and save time, which can be put towards further increasing the practice's profitability. For ECPs enrolled in Shamir's RCPV Rewards Program, the Spark MI could either be purchased by redeeming 262,500 rewards points, or it could be purchased directly for $1,400.00. With the purchase of a Spark MI, Shamir offered ECPs an opportunity to earn an additional 45,000 RCPV rewards points by selling 50 plus pairs of qualifying Shamir lenses within the first 90 days.

59.    According to Relator, Shamir sales representatives would tout the RCVP when calling on ECPs and other purchasers in the field. During training, sales representatives were instructed and taught that one of their primary tools to sell Shamir lenses in the field was to tout the great rewards and cash back purchasers would realize through RCVP. Sales representatives were told that when calling on an ECP, they should try to identify the office "decision maker." In many instances, this was not a doctor, but rather a tech or business manager. According to Relator, Shamir trainers instructed sales representatives to seek this person out because they tended to be more business focused than the doctors, and therefore more receptive to the benefits of RCVP. Thus, Shamir was using RCVP to induce ECPs and other purchasers to prescribe Shamir's lenses over their competitors. Lens purchasers submitted claims for Shamir lenses, tainted by a violation of the AKS, to government and private payers, in violation of the FCA.

### 2. Shamir Provides Enhanced RCVP Rewards Points and Rebates to Buying Groups, Optical Labs and Optical Insurance Providers Through Its RCVP Plus Program

60.    Shamir also provides enhanced RCVP Rewards to retail accounts, optical buying groups, optical laboratories, and optical insurance providers. Shamir called these enhanced rewards the "RCVP Plus" program. The enhanced RCVP

- 21 -

rewards were in addition to the rewards offered to every provider participating in the RCVP. According to Relator, Shamir would provide these organizations with enhanced RCVP rewards in order to secure their business and prevent them from ordering their lenses from a competitor. Shamir offered these organizations enhanced rewards because their purchase volume was so large that giving such rewards made economic sense to Shamir, and it needed the enhanced rewards to secure their business over a competitor.

61.    Relator, as Shamir's Key Account Manager for North America, was responsible for managing Shamir's relationships with large retail accounts, which are retail optical companies with 50 or more locations. Relator was very comfortable in this position as he had previously worked in the optical industry and had already developed relationships with most of the large optical retail chains.

62.    According to Relator, one of the main goals of providing enhanced RCVP Plus rewards was to get a monthly baseline purchase commitment from the buyer. This was normally in the form of a monthly lens purchase requirement. For example, pursuant to Shamir's agreement with ILORI (discussed below), the enhanced RCVP benefits only applied if ILORI purchased 200 pairs of Shamir lenses per month. Shamir billed its customers via monthly invoices so if the baseline was met, the enhanced rewards could be applied to every lens, and not just the lenses purchased after the baseline was met.

63.    Once the baseline was met, the enhanced rewards and rebates were provided for every lens purchased that month. If the baseline was not achieved, the purchaser would only receive the standard RCVP rewards for that month's purchases. For the ILORI example referenced herein, where they had a baseline of 200 lenses per month, if it sold 199 pairs of Shamir lenses in a month, it would only receive the standard RCVP rewards available to every purchaser for each lens. However, if it sold 200 or more, ILORI would receive the enhanced reward points and rebates pursuant to its RCVP Plus agreement with Shamir for each lens.

QUI TAM COMPLAINT (FILED UNDER SEAL)

64. According to Relator, prior to meeting with a corporate representative for a large retail chain to discuss the RCVP Plus program, Relator and Becker would meet to create an enhanced RCVP rewards proposal. In order to create this proposal, Shamir executives would meet to determine pricing, as every large retail customer received a volume discount. Specifically, Ranaan Naftalovich, CEO, Richard Daley, VP of Sales and operations, and Becker would meet to come up with this pricing for a specific client. The price depended on how much profit Shamir needed to make from a particular account. Then, after the pricing was figured out, Relator and Becker would meet to prepare the RCVP forecast. In doing this, Relator and Becker would need to determine how large of RCVP rewards they could give the account, and still reach the desired profit.

65. Becker would create a forecast demonstrating how much money Shamir could spend on a particular account. This money was drawn out of Shamir's Marketing Enhancement account, which, according to Relator, was a pool of money under Becker's control designated to be used to entice purchaser groups, retail chains and others to select Shamir's lenses over competitors. According to Relator, the amount of money from this pool that Shamir would spend on a particular client depended on what Shamir's goal was to grow that account, how much growth was expected, how much potential the retail account had in terms of dollar volume and current usage. Significantly, a primary consideration was Shamir's internal growth goal for the account. According to Relator, Shamir's internal growth goal was based on sales of new, more expensive products, and Shamir used RCVP and spiffs to promote these products. For example, in 2015, Shamir used kickbacks to promote the AIII lens and the Glacier Plus AR coating.

66. New accounts would get better RCVP rewards than existing accounts because new accounts were not currently purchasing any lenses from Shamir, so all new business would also be new growth from these accounts.

67. During these meetings, Relator and Becker would determine how much

- 23 -

money Shamir needed to spend on a certain account to be competitive against other lens manufacturers. They would calculate the price Shamir had to sell the lenses for as well as what enhancements they could provide based on the price. The goal of this process was always to increase business, especially for Shamir's premium, more expensive lenses. After performing this calculation, Relator and Becker would then finalize the proposal and Relator would present it to the retail customer representative.

68. According to Relator, every RCVP Plus arrangement was unique to the specific purchaser. The specific enhanced rewards that the purchaser would receive were subject to negotiation between Shamir and the purchasing organization. In many instances, the purchasing organization would request enhanced RCVP rewards on lenses that they frequently purchased. On the other hand, Shamir was more likely to give enhanced rewards on lenses that they were trying to promote over other brands it sold. Typically, according to Relator, Shamir and the purchasing organization would meet somewhere in the middle. Retail organizations also had a price point which they would try to convince Shamir to agree to. According to Relator, Shamir was concerned about both price and market share, which gave them the ability to provide lower prices in order to gain market share.

69. According to Relator, during his time with Shamir, the Company was primarily focused on promoting its AIII lens and Glacier Plus coating, and the RCPV was one of its main vehicles to accomplish this. This was one of the primary drivers of renewing the RCVP contract with ILORI. When the 2014 RCVP Plus agreement was entered in to, ILORI had not yet placed the AIII on its formulary. Therefore, the AIII was not included in ILORI's 2014 RCVP Plus agreement, and thus had no incentive to promote this lens over other, cheaper lenses. As a result, Shamir wanted to update the agreement to provide large rebates and awards points to the AIII.

70. When Relator was negotiating the 2015 RCPV Plus deal with ILORI representative Jennifer Caraway, Shamir had originally removed its Autograph II lens

QUI TAM COMPLAINT (FILED UNDER SEAL)

from the RCPV Plus enhanced rewards agreement. However, according to Relator's Weekly Report, dated April 10, 2015, "RCPV agreement. Presented draft on Monday afternoon. Jennifer [Caraway] expressed the need to have Autograph II added back into the [RCPV] agreement in order to have a realistic chance of meeting the 200 pair goal per month driven through the Shamir labs. Revised draft sent Friday." Relator confirmed that Caraway was concerned with ILORI's ability to meet the 200 lens baseline without the inclusion of the Autograph II lens. Thus, Shamir had removed the Autograph II from the RCPV Plus plan with ILORI because it was focused on promoting its newer lens, the AIII. However, ILORI wanted the AII included because it was a cheaper, more familiar lens, and therefore easier for its sales associates to sell.

71.    In addition, several of Shamir's competitors were also seeking the same business, and similarly offering rewards to secure it. Thus, in addition to meeting the needs of the purchaser, Shamir also had to ensure that their offer was at least comparable to what was being offered by others in the industry.

72.    If Shamir did get the purchaser to enter into a RCVP Plus agreement, they would then purchase a majority of their lenses from Shamir. According to Relator, no retail purchaser, even if they entered an agreement with Shamir, would agree to purchase lenses exclusively from a single manufacturer.  According to Relator, retail customers always needed a secondary supplier in case something came up and their primary supplier was unable to produce an order. Thus, although the RCVP Plus agreements would ensure that Shamir received a majority of the purchaser's business, it would not result in that customer exclusively purchasing their lenses from Shamir.

73.    After the deal was put in place, Shamir would pay the purchaser for their accrued rewards on a monthly basis. In order to calculate this amount, the purchaser would regularly provide Relator with lens purchase statistics from their retail stores. Relator would then pass this information along to Shamir RCVP department, which

solely verified buyers' lens purchase history, calculated RCVP points, sent out monthly point balance statements, and paid out the accounts via check.

74. According to Relator, invoices sent to purchasers reflected the contract price they negotiated with Shamir. After this invoice was sent, Shamir's RCVP department would calculate their rebate once all of the purchases were verified.

75. For example, Relator was involved in negotiating the RCVP Plus agreement with Luxottica's Retail Luxury Division, ILORI. According to Relator, Shamir had been providing ILORI with enhanced RCVP benefits for years pursuant to an RCVP Plus contract, which was renewed annually. Relator was responsible for working with the ILORI representative, Jennifer Caraway, to develop new terms for the contract renewal which were agreeable to both parties. This involved reviewing the terms of the 2014 contract, as well as new products and ILORI sales history, to determine which products would receive enhanced RCVP rewards, and at what level.

76. At the time, Zeiss was also trying to gain ILORI's business, and were offering it benefits if ILORI selected its lenses as its preferred choice. Relator and Caraway had several discussions regarding Shamir's RCVP enhancements in an attempt to provide ILORI with more value than Zeiss.

77. In May 2015, Shamir and ILORI renewed their RCVP Plus agreement. Pursuant to the contract, Shamir provided ILORI with "rebates for the designs as detailed herein in lieu of standard RCPV rebates." Thus, Shamir and ILORI agreed that ILORI would receive enhanced rebates for certain Shamir lenses. However, ILORI only received the enhanced RCVP rebates if it purchased 200 pairs of Shamir lenses per month. If ILORI failed to purchase 200 Shamir lenses in a month, they would receive the typical benefits provided pursuant to the RCVP. And only lenses purchased from a Shamir partner lab counted toward the 200 baseline. Shamir lenses manufactured in ILORI's labs with a Shamir design – and Shamir was paid a click fee – did not count toward the 200 lens total.

78. Which lenses received enhanced rebates, and the amount of such rebates,

- 26 -

were subject to negotiation between Shamir and ILORI. The chart below is directly from the 2015 contract between Shamir and ILORI and depicts which lenses ILORI would receive enhanced rewards for purchasing.

| Design | RCPV Rebate $/Pair | RCPV Rebate Pts/Pair | RCPV Plus Rebate $/Pair | Total RCPV & RCPV Plus Rebate $/Pair | Total RCPV & RCPV Plus Rebate Pts/Pair |
|---|---|---|---|---|---|
| **FREEFORM** | | | | | |
| Autograph III Fixed® and Variable® | $15.00 | 2,250 | $5.00 | $20.00 | 3000 |
| Attitude™ III Sport | $15.00 | 2,250 | $5.00 | $20.00 | 3000 |
| Attitude™ III Fashion | $15.00 | 2,250 | $5.00 | $20.00 | 3000 |
| Autograph II Fixed® and Variable® | $15.00 | 2,250 | $3.00 | $20.00 | 2,700 |
| Autograph II Attitude™ and Attitude™ Short | $15.00 | 2,250 | $3.00 | $18.00 | 2,700 |
| Shamir InTouch™ | $15.00 | 2,250 | N/A | $18.00 | 2,250 |
| Shamir Computer™ | $6.00 | 900 | $3.00 | $9.00 | 1,350 |
| Shamir WorkSpace™ | $6.00 | 900 | $3.00 | $18.00 | 1,350 |

79.    The chart above demonstrates both the rebate and reward point amounts ECPs typically receive through the RCPV as well as the additional rebate and reward points ILORI ECPs received under its RCPV Plus. In addition, this chart demonstrates that Shamir used the RCPV Plus to promote its most expensive lenses and brands. As demonstrated by the above chart, ILORI received an additional $3-5 rebate and 450-750 extra reward points, above what purchasers typically received pursuant to the RCVP, for each of the lenses listed above. Due to the number of lenses ordered by ILORI, this was a significant inducement that convinced ILORI to purchase its lenses from Shamir over a competitor.

80.    The contract also provided that Shamir would provide ILORI ECPs and sales associates with training on Shamir lenses and products. The training focused on Shamir's high end, more expensive lenses and taught ILORI sales representatives how to convey these products benefits to customers. Specifically, the sales training focused primarily on Shamir's AIII lens, which at the time was the among Shamir's

QUI TAM COMPLAINT (FILED UNDER SEAL)

most expensive lenses. In fact, Relator was instructed, and did in fact, create a training program focused on the AIII, as that was the lens his superiors instructed him to focus his sales efforts on.

81.    For example, in an email between Relator and Caraway, Relator states "With your approval, the training needs to highlight the advanced product technology of Autograph III Progressive and SV as well as Attitude III, Fashion and Sport as well as the digital design and technology in both Computer and Workspace . . . . As we plan the spiff program, the essence of that program should direct them to sell the products that offer the best in design technology to enhance their visual experience." Further, Relator's notes from his March 20, 2015 meeting with Caraway stated, under the "In Store Training" section, that they intend to "Create an in office training for Autograph III, Computer and Workspace[.]" The AIII, Computer, and Workspace lenses are all premier Shamir lenses which are more expensive than the more basic lenses.

82.    The RCVP Plus agreement with ILORI successfully secured Shamir both increased profit and market share.

83.    For example, after the first quarter of 2015, Caraway provided Relator with a sales report. These figures included both sales which occurred while the 2014 RCVP Plus agreement was in place and the 2015 RCVP Plus agreement. Specifically, Caraway stated "Shamir continues to dominate our lens units and volume. Shamir lens units had a 3% comp increase, Luxury overall lens unit increase was 6%. We have seen a shift in our SV/Progressive mix. (running 60/40)[.] DST/Shamir lens sales penetration is much higher in the progressive category than the SV category."

84.    In early August 2015, Caraway reported to Relator the second quarter sales results for Shamir lenses in their stores. Specifically, the report stated:

- 2666 units sold, 66% of the total lenses sold
- Total gross sales at $1.6 million, 66% of total gross lens sales
  - o  Despite a lower count of stores, Shamir penetration and sales

- 28 -

continues to grow!

o Shamir penetration is growing in Luxury stores and posting comp sales increases.

o The June contest helped boost the quarter results with an impressive 20% increase.

85.    The early success of Shamir's kickback scheme continued into the third quarter. In early October 2015, Caraway provided Relator with the third quarter and year to date Shamir sales results. The results showed that due to the kickbacks provided, Shamir accounted for approximately 65% of all lenses sold by ILORI. Specifically, the sales results stated:

**In Q3, Shamir continued to represent the majority of lens sales.**

- 63% of lens units sold in Luxury stores were Shamir lens designs (2402 of the 5114 sold, represents pairs)
    - o -10% comp decrease (LY 2666 Shamir lenses). *Decrease due to September drop off in traffic/sales and Boston closure.*
- 63% of gross lens revenue in Shamir lens designs ($1.4 million of the total $2.2 million in gross lens sales, before discounts applied)
    - o +14% increase in gross revenue (LY $1.2 million)
- Avg gross AUR at $583, very strong and an increase over the trend YTD!
    - o +23% in lens AUR!  This helped offset the unit decrease.  (LY AUR $450)  New packaged pricing has had a significant impact  to AUR.

**YTD results:**

- 65% of lens units sold in Luxury stores were Shamir lens designs (7845 of the 15,900 sold, represents pairs)
    - o +3% comp increase in units (LY 7586)
- 65% of gross lens revenue in Shamir lens designs ($4.5 million of the total $7 million in gross lens sales, before discounts applied)
    - o +25% comp increase in gross sales (LY $3.4 million)
- Avg gross AUR at $573, very strong!
    - o +22% comp gross lens AUR (LY $448)

- 29 -

86.    Further, Shamir provided, in addition to ILORI, numerous buying groups, laboratories, and optical insurance plans enhanced RCVP rewards. For example, Shamir had an RCPV Plus arrangement with Vision Source ("VSE"), a franchise optical retail chain that also acts as a group purchasing organization for its franchisees.

87.    Shamir's RCPV Plus arrangement with Vision Source provided its franchisees with additional points and rebates, above the typical RCPV program, on Shamir lenses. For example, the chart below lists the Shamir lens, the number of RCPV reward points typically associated with that lens, and how many RCPV reward points VSE franchisees received for purchasing the lens pursuant to the RCVP Plus agreement.

| Lens Type | RCPV Points | VSE RCPV Plus Points |
|---|---|---|
| Autograph II – Single Vision | 10 | 30 |
| Spectrum – Single Vision | 10 | 30 |
| Relax | 750 | 1125 |
| Element | N/A | 1125 |
| Autograph II – Office | 900 | 1500 |
| Autograph II – Single Vision Attitude | 900 | 1500 |
| Golf – Single Vision | 900 | 1500 |
| FirstPal | 900 | 1500 |
| Spectrum | 1500 | 2250 |
| Piccolo | 1800 | 2450 |
| Creation | N/A | 2450 |
| Autograph III | 3000 | 3280 |
| Autograph II | 2250 | 3280 |
| Autograph II – Attitude | 2250 | 3280 |

- 30 -
QUI TAM COMPLAINT (FILED UNDER SEAL)

| InTouch | 2250 | 3280 |
|---------|------|------|
| Attitude | 2250 | 3280 |
| Golf | 2250 | 3280 |

88.    As the chart above illustrates, VSE franchises received substantially more RCPV reward points through VSE's RCPV Plus plan. Further, VSE received enhanced points on Shamir's Creation and Element lenses, which were not eligible for reward points under the regular RCPV program.

89.    VSE's RCPV Plus sheet also lists the cash value the enhanced reward points could be redeemed for. The sheet states that lenses worth 30 points can be redeemed for a cash value of $0.16; lenses worth 1125 points can be redeemed for a cash value of $6; lenses worth 1500 points can be redeemed for a cash value of $8; lenses worth 2250 points can be redeemed for a cash value of $12; lenses worth 2450 points can be redeemed for a cash value of $13; lenses worth 3280 can be redeemed for a cash value of $17.50. Thus, there was a substantial incentive for VSE franchisees to promote and sell Shamir's premier lenses over less expensive, more basic lenses.

90.    In addition, VSE franchisees also received the benefit of not having to sell 15 pairs of Shamir lenses to qualify for the RCPV program, unlike independent purchasers. Specifically, the VSE RCPV sheet states "Exclusive for Vision Source Members only, enjoy no monthly minimums and increased rewards."

91.    Shamir also provided enhanced rewards pursuant to a RCVP Plus agreement with Pearl Vision franchises. The agreement between Shamir and Pearl Vision provided enhanced RCVP reward points as well as a lower minimum purchase to qualify for the program. Unlike independent purchasers, that had to sell a minimum of 15 pairs of lenses just to participate in RCVP, Pearl franchises only had to sell five pairs of lenses to participate. Then, once a franchise sold 15 pairs of lenses, they qualified to start receiving the enhanced rewards. Specifically, the

agreement was as follows:

## Pearle Franchisee Partnership Program

Effective 5/1/13 - 12/31/13

Offered exclusively to Pearle Franchises as a supplement to the Shamir RCPV Rewards program.
Offer for 5 pair minimum and increased points good for a limited time only so take advantage now!

| Designs | POINTS EARNED | |
| --- | --- | --- |
| | Minimum of 5-14 pair sold | 15+ pair sold |
| **FREEFORM** | Pair sold required per calendar month | |
| Autograph III Fixed® and Variable® | 1,125 | 3,000 |
| Autograph II Fixed® and Variable® | 1,125 | 3,000 |
| Autograph II Attitude™ and Attitude™ Short | 1,125 | 3,000 |
| Shamir Golf™ | 1,125 | 3,000 |
| Shamir InTouch™ | 1,125 | 3,000 |
| Spectrum™ | 750 | 2,250 |
| FirstPAL™ | 450 | 1,200 |
| Autograph II Single Vision Attitude™ | 450 | 1,200 |
| Autograph II Office™ | 450 | 1,200 |
| Shamir Golf™ Single Vision | 450 | 1,200 |
| **Semi-Finished** | | |
| Piccolo | 900 | 1,800 |
| Creation | 900 | 1,800 |
| Office | 900 | 1,800 |

Qualifying pair are purchases made through Shamir's Partnering Lab network.
Points Earned is based on total pair sold.
For example:
If 14 pair of Autograph III Fixed® and Variable® purchased within one calendar month, Pearle Franchisee will earn 1,125 points per qualifying pair, starting at first pair.
If 15+ pair of Autograph III Fixed® and Variable® purchased within one calendar month, Pearle Franchisee will earn 3,000 points per qualifying pair, starting at first pair.

92.     Additional examples of enhanced rewards include the following:

QUI TAM COMPLAINT (FILED UNDER SEAL)

- **Marion Eye Centers & Optical:**[2] From at least 2013 to the present, Marion Eye Centers offers an additional $12.00 cash-back incentive to its ECPs for Shamir Auto 2 lenses with Crizal. Marion provides its ECPs with an RCPV "Bonus Spiff Sheet" to keep track of the lenses sold and cash earned, which ECPs fax to Marion every month.

- **Block Business Group:**[3] In 2014, Block launched the Block Shamir Program which provides cash or point rewards for buying Shamir products through about 400 participating labs. Shamir also offered Block ECPs a customized YouTube channel for to market their eye care practice, with content provided.

- **Prima Eye Group:**[4] In August 2015, Shamir and Prima Eye Group teamed up to provide special enhanced rewards for Prima ECP members. Prima ECPs are required to purchase Shamir lenses under their Prima Eye Group account and at an authorized Shamir lab to receive an additional cash rebate of up to $20.00 or 3000 points for a variety of Shamir lenses.

- **Vision West:**[5] In mid-2014, Vision West entered a partnership with Shamir for a special enhanced cash promotion for its ECP members from April 1, 2014 to December 31, 2014. The enhanced cash rebates require no minimum purchase requirement for Vision West ECPs. The announcement included a chart illustrating the increased cash back amount for the promotion compared to the standard RCPV reward cash rebate. In addition, the promotion offered a cash rebate for Shamir Element lenses which are normally excluded from RCPV cash rewards.

- **FEA Industries:**[6] From March 1, 2015 through June 1, 2015, FEA offered a cash-back rewards promotion paying additional cash rewards of $50.00 for Shamir Autograph III, $30.00 for Shamir Glass Spectrum & InTouch, and $10.00 for all other Shamir Free-Form lenses to ECPs who dispensed Shamir lenses through its optical lab.

- **VSP:**[7] VSP has consistently partnered with Shamir to pay kickbacks to ECPs who prescribe Shamir lenses to Federal and US Postal employees. For

---

[2] Marion Eye Centers & Optical has 33 locations and over 25 ECPs who provide premium eye care to patients in Southern Illinois and southeast Missouri.

[3] Block Business Group is the largest optical buying group in the United States offering volume discount purchasing, including substantial discounts on lens purchases, to more than 4,000 ECPs, enabling their practices to become more profitable.

[4] Prima Eye Group is a practice management firm for optometrists, helping practices to grow revenues and profits. Prima offers discounts and rebates on lenses from lens manufacturers, including Shamir.

[5] Vision West is a nationwide membership based buying group with over 3,000 ECP members.

[6] FEA Industries is among the top ten of the nation's largest independent optical laboratories.

[7] VSP is a FEDVIP insurance carrier providing optical lens coverage to Federal and US Postal Services employees from 2007 to Present, with an extensive provider

- 33 -

example, in 2013, Shamir partnered with VSP contracted lab, Summit Optical (a buying group and optical lab with over 100 members) to offer an enhanced cash reward promotion for VSP orders from January 1, 2013 through December 31, 2013. The promotion stated: "SHAMIR $15 VSP REWARDS – This one is easy. From January 1, 2013 through December 31, 2013 you will receive a $15 reward just for using Autograph II lenses for your VSP orders. Receive a $10 reward when using Spectrum. Summit Optical will complete all of the tracking and paperwork on your behalf."

**VSPOne Labs**: VSPOne Labs partnered with Shamir from July 1, 2013 through September 30, 2013, to offer the VSPOne Rewards Program – Upgrade Your Digital Promotion which allowed ECPs to earn an additional 10 rewards points for each pair of Shamir digital progressive lenses and an additional 5 rewards points for each pair of Shamir single vision lenses purchased over their monthly baseline goal with a five pair minimum. Each ECP was assigned a baseline goal based on three months of sales data beginning March 2013 and ending May 2013. ECPs also earned 5 additional rewards points when an anti-reflective coating was added.

### 3. Shamir Used to RCVP, RCVP Plus and "Spiffs" to Convince ECPs to Upsell Their Patients to More Expensive Lenses

93. In addition to using the RCVP to gain a majority of an optical practice, buying group, or retail organization's lens purchases, Shamir also used the RCVP to push its more expensive lenses. Shamir did this by offering purchasers even greater enhancements on its more expensive lens brands as well as other inducements. This was true for both RCVP and RCVP Plus. Similar to the above, whether the purchaser would agree to focus on promoting Shamir's more expensive lenses was subject to negotiation.

94. Part of Relator's job was to convince Shamir's retail clients to focus on promoting its newest, and most expensive lenses. According to Relator, Retail customers would not typically promote the best or most expensive lenses to their customers. Therefore, to convince its retail clients to focus on promoting more expensive lenses, Shamir had to make it worth their while. According to Relator, Retail clients were trying to reach a deal that would allow them to maximize their volume sales growth. This was easier to accomplish by promoting the more cost

---

network of over 37,000 ECPs. Federal and US Postal employees who chose VSP must be prescribed lenses from a VSP network provider and providers must dispense lenses from one of 15 VSP Labs (VSPOne) or from one of 250+ VSP contracted independent optical labs.

- 34 -

QUI TAM COMPLAINT (FILED UNDER SEAL)

effective, basic lenses. In most cases, newer lenses were harder to sell because they were more expensive. Thus, it was easier for retail customers to obtain greater sales growth selling basic lenses then it was for selling more expensive lenses.

95. Based on this dynamic, in negotiations with retail customers, the retail representative would always push for more enhanced rewards for Shamir's more basic, cost effective lenses that they sold in large quantities. On the other hand, Relator wanted the bulk of the enhancements to be associated with Shamir's more expensive lenses. According to Relator, in many cases, he and the retail representative would agree to an arrangement where enhanced RCVP rewards were applied to both Shamir's base products as well as its more expensive lines.

96. That Shamir wanted its retail customers to focus on selling their customers more expensive lenses, as opposed to its basic lenses, was explicitly stated during negotiations. For example, when Relator was working on the agreement with ILORI, discussed above, Shamir had just introduced the AIII lens. At the time, the AIII was one of Shamir's most expensive lenses. Relator was instructed by his superiors at Shamir that he needed to use the RCVP enhancements and spiffs to convince its retail customers to promote this lens. The importance to Shamir of pushing the expensive AIII cannot be understated. In Relator's notes from his discussions with Caraway, section 1 is titled "Renewal of the RCVP contract," and the first sentence states "The primary focus of this program [RCVP] is to stimulate growth of Autograph III while offering an incentive for pairs fit." In order to convince ILORI to instruct its sales representatives to promote the AIII, Shamir had to provide extra enhancements for both the AIII and some of its basic lenses.

97. Specifically, during negotiations with Caraway, Relator informed her that Shamir wanted ILORI associates to promote the AIII to its customers. In response, Caraway stated to Relator that "if we [ILORI] are going to make this lens a priority, you need to make it worth it to us." Caraway further explained that many of ILORI's sales associates preferred more basic, less expensive lenses, and in order to

convince them to push the AIII there had to be enhanced RCVP rewards and spiffs attached to such sales to make it worthwhile to its sales associates. According to Relator, Shamir agreed, and provided ILORI with enhanced rewards on the AIII as well as less expensive lenses.

98.    Shamir also induced optical lens purchasers to push its more expensive lenses by providing "spiffs." Spiffs are a term used in optical sales and provide remuneration to Shamir's clients' sales force in exchange for selling a certain product and/or meeting certain sales growth measures. According to Relator, during RCVP enhancement negotiations, Shamir would agree to provide even greater rewards if the purchaser achieved certain sales growth figures. For example, Shamir provided ILORI a spiff program for June 2015 through which ILORI sales associates would receive $7.50, $15, or $20 per pair of Shamir premier lenses sold after ILORI had reached the 200 pairs per month baseline. In this way, Shamir provided remuneration to ILORI, which was then passed down to their sales associates, to promote its more expensive lenses. Significantly, Shamir always covered the cost of the spiffs, even if it was the customer who was managing the program.

99.    Money Shamir paid to sponsor spiff programs came from the marketing enhancements fund controlled by Becker and the aim of these programs was to get the customer to focus their sales efforts on Shamir's newer, more expensive lenses. For example, Relator met with Caraway on March 20, 2015, and his meeting notes state "**Jennifer** would like to provide a new emphasis for selling each quarter. *Example the first promotional period may focus on Autograph III; second around sun and third may be around Autograph III and multiple pair focused on workspace use-computer or workspace lenses.*" (emphasis in original).

100.    Shamir would allow its customers to create the spiff program, and then submit a proposal describing the program and associated costs to Shamir for approval. For example, Relator's weekly report for the week of May 11-15, 2015, states "Discussed promotional activity with a spiff provided for store associates based

QUI TAM COMPLAINT (FILED UNDER SEAL)

on a 20% increase in business for lens growth during the promotion. Jennifer [Caraway] is submitting a plan for approval." In addition, Relator's weekly report for the week of May 18-22, 2015, states "Jennifer sent a request for a spiff provided for store associates based on a 20 % increase in business for lens growth during the promotion. Will discuss specifics of the plan with Mark this week and gain his approval." In addition, on May 26, 2015 email from Relator to Caraway, Relator stated "Also Mark and I have time schedule[d] on Thursday to [sic] create a program providing opportunity based on the 20% growth challenge you have out to your stores. We both think it is a good idea and now are putting our collective thinking power together to come up with a program that works for both parties." In response to this email, Caraway stated "Thank you for your support of the June spiff/incentive. Please let me know ASAP of any changes. We had hoped to run the entire fiscal month of June (starts on June 3rd)."

101. The proposal submitted by Caraway was approved by Shamir in late May 2015 and went into effect in June 2015. Specifically, the June 2015 ILORI spiff program provided:

For the month of June, 1st-30, ILORI/Shamir will sponsor a sales associate spiff enticement to our RCPV program

Spiff will be based on an incentive growth payouts over the current RCVP base of 200 pairs per month – a 15% increase (230 pairs) and a 20% (240 pairs and higher)

If percentage increase is met, per pair bonus will paid on every pair over the base 200 pair level

Bonus paid will be paid on Autograph III progressive; Attitude Fashion and Sport; Computer and Workspace; and all Autograph II ordered from a Shamir partner lab

At 15%, the additional bonus per pair is $7.50. At 20%, the additional pair bonus is $15 dollars for Autograph II (ordered from Shamir partner lab) and computer and workspace; $20 dollars for Autograph III and Attitude III Fashion and Sport

To qualify for the spiff, each associate must sell a minimum of 4 pairs of any of the lenses in the promotion

Sales must take place on the defined promotional period

- 37 -

102. As demonstrated above, Shamir was incentivizing ILORI to sell more AIII, one of its most expensive lenses, by offering large spiffs and rebates for each pair sold. This benefitted both ILORI and Shamir. For Shamir, they were able to use incentives to encourage ILORI sales associates to promote its more expensive lenses. This allowed Shamir to realize both a larger profit – as it was a new product – as well as a greater market share, which could pay long term benefits. This spiff program was also beneficial to ILORI as its RCPV Plus agreement provided the greatest rebate and reward points for the AIII and other premium lenses included in the June 2015 spiff program. And, Shamir paid for the spiff program, so ILORI was able to incentive its sales associates to promote more expensive lenses, reap the associated benefits under RCPV Plus, and Shamir paid for the promotion.

103. The ILORI June 2015 spiff competition was very successful. Specifically, in July 2015, Jennifer provided Relator with the results, stating:

> Attached you will see our final results for our June contest/spiff. We posted amazing increases and exciting totals!
>
> In gross units, Shamir had a +50% comp increase and we exceeded the original goal by 28%!
>
> All but 5 doors met/exceeded their goal.

104. In addition, when Caraway provided Relator with Shamir's second quarter results (discussed above), she specifically referenced the success of the June 2015 spiff program, stating "The June contest helped boost the quarter results with an impressive 20% increase."

105. Shamir would also provide retail customers with remuneration to allow them to do spiffs connected to internal contests to promote Shamir's more expensive lenses. For example, ILORI had a competition where it provided cash to the store location and sales associate who sold the most AIII lenses. In this way, ILORI could entice their stores and sales associates to focus on pushing the AIII, rather than more

basic, cost effective lenses. However, ILORI was incentivizing its stores and associates to promote the AIII over other, cheaper brands at Shamir's request. Shamir directly reimbursed ILORI for the cost of these promotions. For example, in an email from Caraway to Relator and Becker outlining the deal she states "We will pay associates through payroll, have Shamir pay bulk sum for qualified spiffs[.]"

106.   ILORI also awarded a free pair of AIII lenses to any sales associate who sold four or more pairs of AIII lenses. This, too, was used to push sales associates to promote the AIII over other Shamir lenses.  Similar to the example above, Shamir also covered the cost of this promotion.  Specifically, during the RCVP rewards negotiations, Caraway specifically requested "a few more extra lenses for sales contests." In other words, Caraway was asking Relator for free AIII lenses that it could provide to any sales associate who sold four or more pairs of AIII.

107.  Specifically, in late August 2015, Caraway informed ILORI sales associates of the competition, stating:

Quarterly Shamir contest!

For this contest, we are offering every associate a free pair of lenses IF their store makes their Shamir goal.

Contest dates:  August 30th-October 3rd (fiscal September, 5 weeks)

Qualifying lenses:
* All Auto 2 lenses
* All Auto 3 lenses
* All Computer/Workspace
* (must be in current assortment to qualify)

We will send all results mid October and who our free lens coupon winners are by door. The unit goals are based on a 20% increase over LY September sales results.

108.   The contest was held and Shamir provided the free lenses to the winning sales associates. This is confirmed by Relator's October 12-16 weekly report, which states "Lens coupons sent to winners of the ILORI/Shamir lens selling contest[.]"

109.   Shamir also sponsored a spiff program for Luxottica between November

- 39 -

23, 2014 and January 3, 2015, where Luxottica sales associates would earn an extra $5 commission for selling certain Shamir lenses. Specifically, the promotion states "SELL ANY OF THE FOLLOWING FREEFORM DESIGNS AND EARN AN ADDITIONAL $5." The promotion goes on to state that the additional $5 commission would be provided for the following Shamir lenses: Shamir Autograph III, Shamir Autograph II (fixed and variable), Shamir Autograph II – Attitude, Shamir Autograph II – Single Vision, and Shamir Autograph II – Single Vision Attitude. Lastly, the promotion states "PAYOUT WILL BE MADE ON JANUARY 23, 2015."

110. In many instances, Shamir would also provide potential customers gift cards to induce their lens business. These gift cards were in addition to the gift cards purchasers could receive through RCVP.

111. For example, from June 28th to July 1, 2015, Relator attended a Pearl Vision Summit meeting. Relator's weekly report for June 15-19, 2015, states "Materials secured,  three $50 Nordstrom gift cards to be purchased next week for doctor/Pearle franchise owners for this meeting[.]" Further, Relator's weekly report for June 22 to July 2, 2015, states "I took pictures of the booth as well as did a drawing for 2 Starbucks $50 gift cards.  One was an OD from South Dakota and the other winner was a store manager from Georgia.  The drawing and gift bags were a big draw.  Not all vendors provided both.  The stress balls were a big hit—thanks for the idea Mark."

112. Additionally, in Relator's March 20, 2015 notes from his meeting with Caraway, he states "**Rick** to investigate possibility of store contests following the training in June. Example first fit of Autograph III wins a $5 Starbucks card/first person to fit the first 5 pairs wins $10 Starbucks/first to 10 pairs wins a $10 dollar Starbucks card[.]"

113. Lastly, as part of the RCVP rewards agreement, Shamir also agreed to provide product training for Shamir's premium lenses to ILORI's sales associates so

they would have all the necessary information to sell these premium lenses to their customers.

114. Thus, as described above, Shamir used kickbacks to optical lens purchasers to entice them to upsell their customers to more expensive lenses when, in reality, the basic lenses would have been perfectly appropriate and, in the absence of the rewards offered by Shamir, would have been recommended by ILORI's sales staff. In many cases, this extra cost was passed on to government healthcare programs and private insurance who covered the cost of these unnecessary, premium lenses.

### 4. Shamir Intended the RCVP to Induce ECPs to Prescribes Its Lenses to Their Patients

115. Shamir intended that the cash and gifts offered through RCVP would induce ECPs to purchase its lenses over its competitors' lenses, in violation of the AKS. According to Relator, Shamir told its sales force during training that the cash and gifts it offered through RCVP and RCVP Plus were used to convince ECPs and other purchasers to purchase its lenses. Indeed, inducing ECPs and other purchasers was the stated goal of RCVP.

116. Further, in 2005, Relator attended the Vision Council of America annual Executive Summit held in Scottsdale, Arizona, at the Phoenician hotel from January 26, 2005 to January 29, 2005. On the second day of the conference, January 27, 2005, a legal representative from Vistakon, a Johnson and Johnson company, gave a presentation on the AKS. During the presentation, the presenters discussed how kickback schemes were largely occurring in the pharmaceutical industry, but they mirrored some of the programs used in the optical industry. The presenters further urged all optical companies to stop such kickback programs as they likely are violative of the AKS.

117. According to Relator and the attendee sheet from the conference, Shamir CEO Ranaan Naftalovich was also at this conference and heard the presentation. Therefore, there can be no doubt that Shamir knew its conduct violated the AKS.

QUI TAM COMPLAINT (FILED UNDER SEAL)

### D.    The True Cost of Shamir's Lenses

118.    Although Shamir touted the financial benefits of purchasing its lenses over its competitors' lenses, these financial benefits were not passed on to the insurance providers which actually paid for the lenses. Thus, Shamir was able to induce business from ECPs by providing them kickbacks, while at the same time passing the true cost of its products on to customers and insurance plans, including government vision plans.

119.    Insurance plans reimburse ECPs for lenses purchased for their patients. The reimbursement rates are based on either the expected or actual cost of the lenses. Many insurance plans which reimburse based on a fee-schedule use the "list" or "catalog" price to set the reimbursement rates for these lenses. However, the true cost of Shamir's lenses to ECPs is much less after the rebates, reward points and volume discounts are factored into the cost. Therefore, while insurance providers reimbursed ECPs based on what they thought the ECPs were paying for the lenses, ECPs actually paid a much lower amount after factoring in Shamir's financial incentives. This increased reimbursement is a direct result of how Shamir billed purchasers - providing invoices showing the sticker cost, rather than the true cost after all incentives and awards were accounted for. Vision plans only reimbursed at such levels for Shamir's lenses because they believed the list price was the actual price purchasers paid for Shamir's products. This induced purchasers to select Shamir's lenses because they were able to profit from the spread - the difference between the sticker price listed on the invoice which insurance providers used to calculate reimbursement and the actual cost to the purchaser.

120.    Shamir's pricing structure of hiding discounts and rebates on the back-end of the purchase also resulted in insurance plans, including the Medicaid plans of many states, paying significantly more for Shamir's lenses. Had the government known it was reimbursing at much rates higher than Shamir charged, it would not have provided such a high reimbursement. Rather, it would only have reimbursed the

QUI TAM COMPLAINT (FILED UNDER SEAL)

ECP for the actual cost of the lens, after taking into account all discounts, rebates and other price reductions or offsets.

121.   Shamir sold lenses to laboratories at a contract price and would submit a monthly invoice to them for lenses sold. In addition, Shamir also charged a click fee, which was a fee for using Shamir's lens designs. If an ECP ordered a lens, the laboratory would make the lens and send it to the ECP at the price it paid, plus a lab markup. The ECP would then bill the patient's insurance for the price it paid, plus a markup. In many instances, the markup was paid by the patient via a copayment, as many vision plans only reimburse based on actual invoice cost.

122.   Significantly, Shamir knew that insurance plans, including government healthcare programs, reimbursed optical lenses based on the purported invoice price. Knowing this, Shamir intentionally designed its reward program to hide these price reductions from insurance plans to induce ECPs and other purchasers to purchase its lenses so they would reap the financial benefits of Shamir's back-end discounts. Thus, ECPs and other purchasers were able to profit from the spread between the reimbursement cost at invoice price and the actual price paid for the lens. Shamir provided no notice to any of its purchasers that they should report the true cost of its lenses to the insurance provider.

123.   Further, Relator was involved in negotiations with vision insurance and managed care plans to get Shamir lenses and coatings on their formularies. During these negotiations, the Shamir representative would detail the lens and its pricing to the vision plan so they could understand reimbursement. According to Relator, in going over price, Shamir would only reveal the usual retail price, and would not mention any of the discounts, rebates, or award points that purchasers receive when they purchased the lens. Thus, the only price insurance plans had was the retail sticker price Shamir provided.   Frequently, insurance providers like VSP and EyeMed would fit premium lenses, like the family of AIII, in premium categories (often time denoted by letters).   The higher the category, the more the insurance

provider would reimburse for the lens.

124. Although some plans have a set fee schedule for optical products, many plans reimburse based upon the invoice price. The term "invoice price" is also referred to as the "acquisition cost," "provider charge," "by report," "manually priced," or "individual consideration." Although some plans use different terms, all of these terms represent that the insurance plan reimburses based upon the actual price paid by the ECP. Indeed, many state Medicaid plans require the ECP to submit a copy of the invoice when seeking reimbursement for optical lenses. Therefore, Shamir provided ECPs with discounts and rebates on the back-end of the transaction to allow the ECP to receive a greater profit.

125. Specifically, the following state Medicaid programs reimburse based upon catalog/invoice price: Arizona, California, Colorado, Indiana, Iowa, Louisiana, Massachusetts, Maryland, Michigan, Missouri, North Carolina, Nebraska, New Jersey, Nevada, New Mexico, New York, Ohio, Pennsylvania, Rhode Island, South Dakota, Virginia, West Virginia, Wyoming, and Georgia (Georgia reimburses based on invoice price, minus $20). Further, Kentucky, Ohio, New York, Connecticut, and Kansas also reimburse by invoice price under certain circumstances.

126. The government never intended for ECPs to profit solely from ordering optical lenses. However, Shamir provided volume discounts and rebates which was not reflected in the list price, and knew insurance providers reimburse based on this amount. This was intentional. Shamir knew that by lowering its prices in this way – back door discounts and rebates – that they could use this pricing system to entice ECPs to order its products because the falsely inflated list price resulted in more profit than the ECP would have otherwise received. Thus, as a result of Shamir's conduct of providing ECPs with invoices listing an inflated price, Government Healthcare Programs paid more than the actual price of the lens to ECPs. This conduct violates the AKS.

# COUNT I

## (False Claims Act, 31 U.S.C. § 3729 *et seq.*)

127. Relator repeats each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

128. As described above, Defendants has submitted and/or caused to be submitted false or fraudulent claims to Medicare and Medicaid by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of the fraud described above.

129. By virtue of the acts described above, Defendants have violated:

(1) 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2) 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim;

(3) 31 U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of subparagraphs (A), (B), and (G); and/or

(4) 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

130. To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator realleges that Defendants knowingly violated 31 U.S.C. §§ 3729(a)(1)-(3) and (a)(7) prior to amendment, by engaging in the above-described conduct.

131. By reason of the foregoing, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

- 45 -

WHEREFORE, Relator prays that the Court enter judgment against Defendants as follows:

(a)     that the United States be awarded damages in accordance with the FCA;

(b)     that civil penalties be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c)     that attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case be awarded;

(d)     that Relator be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(e)     that this Court order such other and further relief as it deems proper.

## COUNT II

### (California False Claims Act, Cal. Gov't Code § 12650 *et seq.*)

132.   Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

133.   This is a *qui tam* action brought by Relator on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

134.   Cal. Gov't Code § 12651(a) provides liability for any person who:

(1)     Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

(3)     Conspires to commit a violation of this subdivision.

(4)     Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and

- 46 -

knowingly delivers or causes to be delivered less than all of that property.

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used.

(6) Knowingly buys or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

(8) Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

135. Defendants violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded health care programs.

136. The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' conduct, paid the claims submitted by health care providers and third-party payers in connection therewith.

137. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes was also a condition of payment of claims submitted to the State of California.

138. Had the State of California known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with

QUI TAM COMPLAINT (FILED UNDER SEAL)

Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

139. As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

140. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

141. This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of California:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants presented or caused to be presented to the State of California;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

QUI TAM COMPLAINT (FILED UNDER SEAL)

(4) Such further relief as this Court deems equitable and just.

## COUNT III

**(California Insurance Fraud Prevention Act, Cal Ins. Code §§ 1871.1 *et seq.*)**

142. All of the preceding allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

143. This is a claim for treble damages and penalties under the CIFPA.

144. Pursuant to Cal. Ins. Code § 1871.4(a), it is unlawful to:

(1) Make or cause to be made a knowingly false or fraudulent material statement or material representation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code.

(2) Present or cause to be presented a knowingly false or fraudulent written or oral material statement in support of, or in opposition to, a claim for compensation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code.

(3) Knowingly assist, abet, conspire with, or solicit a person in an unlawful act under this section.

(4) Make or cause to be made a knowingly false or fraudulent statement with regard to entitlement to benefits with the intent to discourage an injured worker from claiming benefits or pursuing a claim. . . .

145. By virtue of the acts described above, Defendants knowingly utilized a scheme by which it presented, or caused to be presented, false or fraudulent claims to private insurers in California, or for patients in California that those insurers covered (i.e., patients who hold private insurance contracts and against whom Defendants could file claims for payment or approval) in violation of each patient's private health insurance contract.

146. By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements and omitted material facts to induce the private insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

147. By virtue of the acts described above, Defendants conspired to violate the CIFPA and each patient's private health insurance contract.

- 49 -

148.   The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

149.   Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligation to return overpayments to these private insurance companies.

150.   By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

151.   Each claim for reimbursement that was a result of Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

152.   The State of California is entitled to the maximum penalty of $10,000 per violation, plus an assessment of three times the amount of each false or fraudulent claim for compensation made, used, presented or caused to be made, used, or presented by Defendants.

## COUNT IV

**(Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*)**

153.   Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

154.   This is a *qui tam* action brought by Relator on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*

155.   Colorado's Medicaid False Claims Act, C.R.S.A. § 25.5-4-305, provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false

- 50 -

record or statement material to a false or fraudulent claim;

(c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

(d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; or

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

156. Defendants violated the Colorado Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

157. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Colorado.

158. The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

159. Compliance with applicable Medicare, Medicaid and the various other

- 51 -

federal and state laws cited herein was a condition of payment of claims submitted to the State of Colorado in connection with Defendants' conduct. Compliance with applicable Colorado statutes was also a condition of payment of claims submitted to the State of Colorado.

160. Had the State of Colorado known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

161. As a result of Defendants' violations of the Colorado Medicaid False Claims Act, the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

162. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Colorado Medicaid False Claims Act on behalf of himself and the State of Colorado.

163. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Colorado:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Colorado, except that this upper limit on liability is subject to an automatic adjustment in accordance with the federal Civil Penalties Inflation Adjustment Act of 1990 ("CPIAA");

(3) Pre- and post-judgment interest; and

- 52 -

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT V

**(Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq.*)**

164.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

165.    This is a *qui tam* action brought by Relator on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*

166.    Conn. Gen. Stat. § 4-275 imposes liability as follows:

(a) No person shall:

(1) Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program;

(2) Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;

(3) Conspire to commit a violation of this section;

(4) Having possession, custody or control of property or money used, or to be used, by the state relative to a state-administered health or human services program, knowingly deliver, or cause to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the state relative to a state-administered health or human services program and intending to defraud the state,

- 53 -

make or deliver such document without completely knowing that the information on the document is true;

(6) Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the state relative to a state-administered health or human services program, who lawfully may not sell or pledge the property;

(7) Knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program; or

(8) Knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services program.

167. Defendants violated the Connecticut False Claims Act and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

168. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Connecticut.

169. The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

170. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Connecticut in connection with Defendants' conduct. Compliance with applicable Connecticut statutes was also a condition of payment of claims submitted to the State of Connecticut.

171. Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with

QUI TAM COMPLAINT (FILED UNDER SEAL)

Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

172. As a result of Defendants' violations of the Connecticut False Claims Act, the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

173. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Connecticut False Claims Act on behalf of himself and the State of Connecticut.

174. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Connecticut:

(1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Connecticut, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Connecticut False Claims Act, Conn. Gen. Stat. § 4-275 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

- 55 -

(4) Such further relief as this Court deems equitable and just.

## COUNT VI

**(Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*)**

175. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

176. This is a *qui tam* action brought by Relator on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*

177. 6 Del. C. § 1201(a) in pertinent part provides for liability for any person who:

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (3) Conspires to commit a violation of paragraph (a)(1), (2), . . . or (7) of this section; or
>
> * * *
>
> (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

178. Defendants furthermore violated the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

179. By virtue of the acts described above, Defendants conspired to submit

- 56 -

false claims to the State of Delaware.

180. The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

181. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' conduct. Compliance with applicable Delaware statutes and regulations was also an express condition of payment of claims submitted to the State of Delaware.

182. Had the State of Delaware known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

183. As a result of Defendants' violations of the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

184. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, on behalf of himself and the State of Delaware.

185. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Delaware:

(1) Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT VII

### (Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*)

186. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

187. This is a *qui tam* action brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

188. Fla. Stat. § 68.082(2) provides liability for any person who:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; or

(c) Conspires to commit a violation of this subsection.

189. Defendants further violated Fla. Stat. § 68.082(2) and knowingly caused

- 58 -

false claims to be made, used and presented to the State of Florida by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

190. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Florida.

191. The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

192. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct. Compliance with applicable Florida statutes was also a condition of payment of claims submitted to the State of Florida.

193. Had the State of Florida known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

194. As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

195. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

196. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and

QUI TAM COMPLAINT (FILED UNDER SEAL)

merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Florida:

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Florida;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT VIII

**(Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*)**

197.	Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

198.	This is a *qui tam* action brought by Relator on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*

199.	The Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168-1, imposes liability on any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

- 60 -

(3) Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection;

(4) Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and knowingly delivers, or causes to be delivered, less than all of such property or money;

(5) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

200. Defendants violated the Georgia False Medicaid Claims Act and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

201. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Georgia.

202. The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

203. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes was also a condition of payment of claims submitted to

QUI TAM COMPLAINT (FILED UNDER SEAL)

the State of Georgia.

204. Had the State of Georgia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

205. As a result of Defendants' violations of the Georgia False Medicaid Claims Act, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

206. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Georgia False Medicaid Claims Act on behalf of himself and the State of Georgia.

207. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Georgia:

(1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168, and/or any other applicable provision of law;

- 62 -

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT IX

### (Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*)

208. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

209. This is a *qui tam* action brought by Relator on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

210. Section 661-21(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

* * *

(6) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State; or

* * *

(8) Conspires to commit any of the conduct described in this subsection.

211. Defendants violated Haw. Rev. Stat. § 661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

212. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Hawaii.

- 63 -

213. The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

214. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes was also a condition of payment of claims submitted to the State of Hawaii.

215. Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

216. As a result of Defendants' violations of Haw. Rev. Stat. § 661-21, the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

217. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-21 on behalf of himself and the State of Hawaii.

218. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

- 64 -

To the State of Hawaii:

(1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-21 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT X

### (Illinois False Claims Act, 740 ILCS 175/1 *et seq.*)

219. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

220. This is a *qui tam* action brought by Relator on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*

221. 740 ILCS 175/3(a)(1) provides liability for any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(C) conspires to commit a violation of subparagraph (A), (B) . . . .

222. Defendants violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and

- 65 -

systematic violation of federal and state laws by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

223. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Illinois.

224. The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

225. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct. Compliance with applicable Illinois statutes was also a condition of payment of claims submitted to the State of Illinois.

226. Had the State of Illinois known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

227. As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

228. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of himself and the State of Illinois.

229. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and

merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Illinois:

(1) Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Illinois;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses, which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XI

**(Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §§ 92/1 *et seq.*)**

230. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

231. This is a claim for treble damages and penalties under the IICFPA.

232. Pursuant to 740 Ill. Comp. Stat. § 92/5(a):

A person who violates any provision of this Act, . . . or Section 17-10.5 of the Criminal Code . . . shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

233. 720 Ill. Comp. Stat. § 5/17-10.5 provides, in pertinent part:

(a) Insurance fraud.

- 67 -

(1) A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.

(2) A person commits health care benefits fraud against a provider, other than a governmental unit or agency, when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider.

* * *

(c) Conspiracy to commit insurance fraud. . . .

234. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois that those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

235. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

236. Defendants knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

237. By virtue of the acts described above, Defendants knowingly utilized a scheme by which it presented, or caused to be presented, false or fraudulent claims to private insurers in Illinois, or for patients in Illinois that those insurers covered (i.e., patients who hold private insurance contracts and against whom Defendants could

- 68 -

file claims for payment or approval) in violation of each patient's private health insurance contract.

238. By virtue of the acts described above, Defendants conspired to violate the IICFPA and each patient's private health insurance contract.

239. The private insurers in Illinois, or those insurers that covered patients in Illinois, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

240. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments to these private insurance companies.

241. By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

242. Each claim for reimbursement that was a result of Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

243. State of Illinois is entitled to the maximum penalty of $10,000 per violation, plus an assessment of three times the amount of each false or fraudulent claim for compensation made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XII

**(Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*)**

244. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

245. This is a *qui tam* action brought by Relator on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims

and Whistleblower Protection Act, Ind. Code 5-11-5.5-2, which imposes liability on:

    (b) A person who knowingly or intentionally:

        (1) presents a false claim to the state for payment or approval;

        (2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

        (3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

        (4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

        (5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

        (6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

        (7) conspires with another person to perform an act described in subdivisions (1) through (6); or

        (8) causes or induces another person to perform an act described in subdivisions (1) through (6) . . . .

246.    Defendants violated the Indiana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

247.    By virtue of the acts described above, Defendants conspired to submit false claims to the State of Indiana.

248.    The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

249.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Indiana in connection with Defendants' conduct. Compliance with

applicable Indiana statutes was also a condition of payment of claims submitted to the State of Indiana.

250.    Had the State of Indiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

251.    As a result of Defendants' violations of Indiana's False Claims Act, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

252.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Ind. Code § 5-11-5.5 *et seq.* on behalf of himself and the State of Indiana.

253.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Indiana:

(1) Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Indiana, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

- 71 -

To Relator:

(1) The maximum amount allowed pursuant to Ind. Code § 5-11-5.5 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIII

**(Iowa False Claims Law, I.C.A. § 685.1 *et seq.*)**

254. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

255. This is a *qui tam* action brought by Relator on behalf of the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*

256. Iowa False Claims Law, I.C.A. § 685.2, in pertinent part provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(c) Conspires to commit a violation of paragraph "a", "b" . . .

257. Defendants violated the Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Iowa by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

258. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Iowa.

259. The State of Iowa, by and through the Iowa Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

260. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Iowa in connection with Defendants' conduct. Compliance with applicable Iowa statutes was also a condition of payment of claims submitted to the State of Iowa.

261. Had the State of Iowa known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

262. As a result of Defendants' violations of the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

263. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, on behalf of himself and the State of Iowa.

264. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Iowa:

(1) Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for

- 73 -

each false claim which Defendants caused to be presented to the State of Iowa, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses, which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIV

**(Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*)**

265. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

266. This is a *qui tam* action brought by Relator on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

267. La. Rev. Stat. Ann. § 46:438.3 provides:

(A) No person shall knowingly present or cause to be presented a false or fraudulent claim.

(B) No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

(C) No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

(D) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

- 74 -
QUI TAM COMPLAINT (FILED UNDER SEAL)

268. Defendants further violated La. Rev. Stat. Ann. § 46:438.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

269. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Louisiana.

270. The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

271. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

272. Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

273. As a result of Defendants' violations of La. Rev. Stat. Ann. § 46:438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

- 75 -

274. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. § 46:439.1(A) on behalf of himself and the State of Louisiana.

275. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Louisiana:

(1) Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Louisiana, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XV

**(Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*)**

276. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

277. This is a *qui tam* action brought by Relator on behalf of the State of Maryland to recover treble damages and civil penalties under the Maryland False

- 76 -

Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*

278. Section 2-602 of Maryland's False Claims Act imposes liability as follows:

(a) A person may not:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspire to commit a violation under this subtitle;

(4) Have possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly deliver or cause to be delivered to the State less than all of that money or other property;

(5) (i) Be authorized to make or deliver a receipt or other document certifying receipt of money or other property used or to be used by the State under a State health plan or a State health program; and (ii) Intending to defraud the State or the Department, make or deliver a receipt or document knowing that the information contained in the receipt or document is not true;

(6) Knowingly buy or receive as a pledge of an obligation or debt publicly owned property from an officer, employee, or agent of a State health plan or a State health program who lawfully may not sell or pledge the property;

(7) Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

(8) Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

279. Defendants violated the Maryland False Claims Act, and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible

- 77 -

for reimbursement by the government-funded healthcare programs.

280. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Maryland.

281. The State of Maryland, by and through the Maryland Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

282. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' conduct. Compliance with applicable Maryland statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Maryland.

283. Had the State of Maryland known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

284. As a result of Defendants' violations of the Maryland False Claims Act, the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

285. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Maryland False Claims Act on behalf of himself and the State of Maryland.

286. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its

Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Maryland:

(1) Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' conduct;

(2) A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Maryland;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Maryland False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVI

**(Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*)**

287. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

288. This is a *qui tam* action brought by Relator on behalf of the State of Michigan to recover treble damages and civil penalties under Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.603, which provides in pertinent part:

(1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits.

(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit. . . .

289. Defendants violated Michigan law and knowingly caused false claims to be made, used and presented to the State of Michigan by its deliberate and systematic

- 79 -

violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

290. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Michigan.

291. The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

292. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Michigan in connection with Defendants' conduct. Compliance with applicable Michigan statutes was also a condition of payment of claims submitted to the State of Michigan.

293. Had the State of Michigan known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

294. As a result of Defendants' violations of the Medicaid False Claims Act, the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

295. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Medicaid False Claims Act on behalf of himself and the State of Michigan.

296. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and

merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Michigan:

(1) Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVII

### (Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*)

297.  Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

298.  This is a *qui tam* action brought by Relator on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*

299.  Minnesota False Claims Act, M.S.A. § 15C.02, provides for liability for any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false

- 81 -

record or statement material to a false or fraudulent claim;

(3) knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7);

(4) has possession, custody, or control of property or money used, or to be used, by the state or a political subdivision and knowingly delivers or causes to be delivered less than all of that money or property;

(5) is authorized to make or deliver a document certifying receipt for money or property used, or to be used, by the state or a political subdivision and, intending to defraud the state or a political subdivision, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a political subdivision who lawfully may not sell or pledge the property; or

(7) knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision.

300. Defendants violated the Minnesota False Claims Act and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

301. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Minnesota.

302. The State of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

303. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Minnesota in connection with Defendants' conduct. Compliance with

applicable Minnesota statutes was also a condition of payment of claims submitted to the State of Minnesota.

304.  Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

305.  As a result of Defendants' violations of the Minnesota False Claims Act, the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

306.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Minnesota False Claims Act on behalf of himself and the State of Minnesota.

307.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Minnesota:

(1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Minnesota False Claims

- 83 -

QUI TAM COMPLAINT (FILED UNDER SEAL)

Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XVIII</u>

### (Montana False Claims Act, MCA § 17-8-401 *et seq.*)

308.　Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

309.　This is a *qui tam* action brought by Relator on behalf of the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MCA § 17-8-401 *et seq.*

310.　Montana's False Claims Act, MCA § 17-8-403, provides for liability for any person who:

(a) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c) conspires to commit a violation of this subsection (1);

(d) has possession, custody, or control of public property or money used or to be used by the governmental entity and knowingly delivers or causes to be delivered less than all of the property or money;

(e) is authorized to make or deliver a document certifying receipt of property used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, makes or delivers a receipt without completely knowing that the information on the receipt is true;

(f) knowingly buys or receives as a pledge of an obligation or debt public property of the governmental entity from any person who may not lawfully sell or pledge the property;

(g) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a

- 84 -

governmental entity; or

(h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

311. Defendants violated the Montana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Montana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

312. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Montana.

313. The State of Montana, by and through the Montana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

314. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Montana in connection with Defendants' conduct. Compliance with applicable Montana statutes was also a condition of payment of claims submitted to the State of Montana.

315. Had the State of Montana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

316. As a result of Defendants' violations of the Montana False Claims Act,

QUI TAM COMPLAINT (FILED UNDER SEAL)

the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

317. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Montana False Claims Act on behalf of himself and the State of Montana.

318. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Montana:

(1) Three times the amount of actual damages which the State of Montana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Montana;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Montana False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIX

**(Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*)**

319. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

- 86 -

320. This is a *qui tam* action brought by Relator on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*

321. N.R.S. § 357.040(1) provides liability for any person who:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b) Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.

(c) Has possession, custody or control of public property or money used or to be used by the State or a political subdivision and knowingly delivers or causes to be delivered to the State or a political subdivision less money or property than the amount of which the person has possession, custody or control.

(d) Is authorized to prepare or deliver a document that certifies receipt of money or property used or to be used by the State or a political subdivision and knowingly prepares or delivers such a document without knowing that the information on the document is true.

(e) Knowingly buys, or receives as a pledge or security for an obligation or debt, public property from a person who is not authorized to sell or pledge the property.

(f) Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision.

(g) Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

(h) Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the State or political subdivision within a reasonable time.

(i) Conspires to commit any of the acts set forth in this subsection.

322. Defendants violated N.R.S. § 357.040(1) and knowingly false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the

government-funded healthcare programs.

323. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Nevada.

324. The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

325. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Nevada in connection with Defendants' conduct. Compliance with applicable Nevada statutes was also a condition of payment of claims submitted to the State of Nevada.

326. Had the State of Nevada known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

327. As a result of Defendants' violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

328. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself and the State of Nevada.

329. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

QUI TAM COMPLAINT (FILED UNDER SEAL)

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Nevada:

(1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Nevada, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.R.S. § 357.040 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XX

### (New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*)

330. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

331. This is a *qui tam* action brought by Relator on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*

332. N.J.S.A. § 2A:32C-3, provides for liability for any person who:

(a) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c) Conspires to defraud the State by getting a false or fraudulent

- 89 -

claim allowed or paid by the State;

(d) Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(e) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

(f) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

(g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

333. Defendants violated the New Jersey False Claims Act and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

334. By virtue of the acts described above, Defendants conspired to submit false claims to the State of New Jersey.

335. The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

336. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Jersey in connection with Defendants' conduct. Compliance with applicable New Jersey statutes was also a condition of payment of claims submitted to the State of New Jersey.

337. Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with

QUI TAM COMPLAINT (FILED UNDER SEAL)

Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

338. As a result of Defendants' violations of the New Jersey False Claims Act, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

339. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the New Jersey False Claims Act on behalf of himself and the State of New Jersey.

340. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of New Jersey:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act for each false claim which Defendants caused to be presented to the State of New Jersey;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to New Jersey False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

- 91 -

QUI TAM COMPLAINT (FILED UNDER SEAL)

## COUNT XXI

**(New Jersey Medical Assistance & Health Services, Act, N.J.S.A. 30:4D-1 *et seq.*)**

341. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

342. The New Jersey Medical Assistance and Health Services Act ("NJMAHS"), N.J.S.A. 30:4D-1 *et seq.*, is aimed at providing medical assistance to residents with limited resources, but also provides FCA-like protections in the event of a violation.

343. Pursuant to N.J.S.A. 30:4D-17(b), it is illegal for any provider, or any person, firm, partnership, or entity to:

> (1) Knowingly and willfully make or cause to be made any false statement or representation of a material fact in any cost study, claim form, or any document necessary to apply for or receive any benefit or payment under P.L.1968, c.413; or

> (2) At any time knowingly and willfully make or cause to be made any false statement, written or oral, of a material fact for use in determining rights to such benefit or payment under P.L.1968, c.413; or

> (3) Conceal or fail to disclose the occurrence of an event which

>> (i) affects a person's initial or continued right to any such benefit or payment, or

>> (ii) affects the initial or continued right to any such benefit or payment of any provider or any person, firm, partnership, corporation, or other entity in whose behalf a person has applied for or is receiving such benefit or payment with an intent to fraudulently secure benefits or payments not authorized under P.L.1968, c.413 or in a greater amount than that which is authorized under P.L.1968, c.413; or

> (4) Knowingly and willfully convert benefits or payments or any part thereof received for the use and benefit of any provider or any person, firm, partnership, corporation, or other entity to a use other than the use and benefit of such provider or such person, firm, partnership, corporation, or entity . . . .

344. In addition to any other penalties provided by law, violators of the NJMAHS shall be liable for civil penalties of: (1) payment of interest on the amount of the excess benefits or payments at the maximum legal rate in effect on the date the

- 92 -

payment was made; (2) payment of an amount not to exceed three-fold the amount of such excess benefits or payments; and (3) payment in the sum of not less than and not more than the civil penalty allowed under the federal False Claims Act, as it may be adjusted for inflation, for each claim for assistance, benefits or payment. N.J.S.A. 30:4D-17(e).

345. In this matter, Defendants submitted bills to the New Jersey State Government for payment and retained improperly obtained payments arising from their illegal scheme discussed herein. All such false claims were knowingly submitted to get false or fraudulent claims paid or approved by the New Jersey State Government.

346. By virtue of the acts described above, Defendants conspired to submit false claims to the State of New Jersey.

347. As a result of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the State of New Jersey is entitled to at least $10,781 and not more than $21,563 for each false or fraudulent claim, plus three times the amount of damages which the State sustains arising from Defendants' unlawful conduct as described herein.

## COUNT XXII

**(New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*)**

348. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

349. This is a *qui tam* action brought by Relator on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, which provides in pertinent part:

A person shall not:

    (1) knowingly present, or cause to be presented, to an employee, officer or agent of the state or a political subdivision or to a contractor, grantee, or other recipient of state funds or political

subdivision funds a false or fraudulent claim for payment or approval;

(2) knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim; or

(3) conspire to defraud the state or a political subdivision by obtaining approval or payment on a false or fraudulent claim .

. . .

N.M. Stat. Ann. § 44-9-3(A)(1)-(3).

350. Defendants violated N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

351. By virtue of the acts described above, Defendants conspired to submit false claims to the State of New Mexico.

352. The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

353. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Mexico in connection with Defendants' conduct. Compliance with applicable New Mexico statutes was also a condition of payment of claims submitted to the State of New Mexico.

354. Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information,

it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

355.    As a result of Defendants' violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.*, the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

356.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* on behalf of himself and the State of New Mexico.

357.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Mexico:

(1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXIII

**(New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*)**

358. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

359. This is a *qui tam* action brought by Relator on behalf of the State of New York to recover treble damages and civil penalties under the New York State False Claims Act, N.Y. State Fin. Law § 189, which imposes liability on any person who:

(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(c) conspires to commit a violation of paragraph (a), (b) . . . .

360. Defendants violated the New York State False Claims Act, and knowingly caused false claims to be made, used and presented to the State of New York, by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

361. By virtue of the acts described above, Defendants conspired to submit false claims to the State of New York.

362. The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

363. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New York in connection with Defendants' conduct. Compliance with applicable New York statutes was also a condition of payment of claims submitted to the State of New York.

364. Had the State of New York known that Defendants were violating the

- 96 -

federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

365. As a result of Defendants' violations of the New York State False Claims Act, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

366. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the New York State False Claims Act, on behalf of himself and the State of New York.

367. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of New York:

(1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendants caused to be presented to the State of New York;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the New York State False Claims Act, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXIV

**(North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*)**

368. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

369. This is a *qui tam* action brought by Relator on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*

370. North Carolina's False Claims Act, N.C.G.S.A. § 1-607(a), provides for liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

(4) Has possession, custody, or control of property or money used or to be used by the State and knowingly delivers or causes to be delivered less than all of that money or property.

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true.

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any officer or employee of the State who lawfully may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

371. Defendants violated the North Carolina False Claims Act, and knowingly caused false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws and by

- 98 -

virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

372. By virtue of the acts described above, Defendants conspired to submit false claims to the State of North Carolina.

373. The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

374. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendants' conduct. Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of North Carolina.

375. Had the State of North Carolina known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

376. As a result of Defendants' violations of the North Carolina False Claims Act, the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

377. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the North Carolina False Claims Act on behalf of himself and the State of North Carolina.

378. This Court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of North Carolina:

(1) Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of North Carolina;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to North Carolina False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XXV

**(Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*)**

379. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

380. This is a *qui tam* action brought by Relator on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*

381. Oklahoma's Medicaid False Claims Act, 63 Okl. St. Ann. § 5053.1, provides for liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of the Oklahoma Medicaid False Claims Act;

(4) Has possession, custody, or control of property or money used, or to be used, by the state knowingly delivers, or causes to be delivered, less than all of such money or property;

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the state who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

382. Defendants violated the Oklahoma Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

383. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Oklahoma.

384. The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

385. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Oklahoma in connection with

- 101 -

Defendants' conduct. Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

386. Had the State of Oklahoma known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

387. As a result of Defendants' violations of the Oklahoma Medicaid False Claims Act, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

388. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Oklahoma Medicaid False Claims Act on behalf of himself and the State of Oklahoma. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Oklahoma:

(1) Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Oklahoma;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Oklahoma Medicaid

- 102 -

QUI TAM COMPLAINT (FILED UNDER SEAL)

False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXVI

### (Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.)*

389. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

390. This is a *qui tam* action brought by Relator on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*

391. Rhode Island's False Claims Act, Gen. Laws 1956, § 9-1.1-3, provides for liability for any person who:

(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of subdivisions 9-1.1-3(1), (2), (3), (4), (5), (6) or (7);

(4) Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less property than all of that money or property;

(5) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the guard, who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

- 103 -

QUI TAM COMPLAINT (FILED UNDER SEAL)

392. Defendants violated the Rhode Island False Claims Act and knowingly caused false claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

393. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Rhode Island.

394. The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

395. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' conduct. Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

396. Had the State of Rhode Island known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

397. As a result of Defendants' violations of the Rhode Island False Claims Act, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

398. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Rhode

Island False Claims Act on behalf of himself and the State of Rhode Island.

399.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Rhode Island:

(1) Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Rhode Island;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Rhode Island False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXVII

**(Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)**

400.   Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

401.   This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

402.   Section 71-5-182(a)(1) provides liability for any person who:

a.   Knowingly presents, or causes to be presented, a false or

fraudulent claim for payment or approval under the medicaid program;

b. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the medicaid program;

c. Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)((B), or (a)(1)((D); or

d. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program.

403. Defendants violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

404. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Tennessee.

405. The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

406. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct. Compliance with applicable Tennessee statutes was also a condition of payment of claims submitted to the State of Tennessee.

407. Had the State of Tennessee known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-

funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

408. As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

409. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.

410. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Tennessee:

(1) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $25,000 for each false claim which Defendants caused to be presented to the State of Tennessee, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

QUI TAM COMPLAINT (FILED UNDER SEAL)

## COUNT XXVIII

### (Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*)

411.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

412.    This is a *qui tam* action brought by Relator on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

413.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who:

(1)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3)    knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

(4)    knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

   a.    the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as . . . .

   b.    information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5)    except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(6)    knowingly presents or causes to be presented a claim for payment

- 108 -

under the Medicaid program for a product provided or a service rendered by a person who:

   a.  is not licensed to provide the product or render the service, if a license is required; or

   b.  is not licensed in the manner claimed;

(7)  knowingly makes or causes to be made a claim under the Medicaid program for:
   a.  a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner;

   b.  a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

   c.  a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

(8)  makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

(9)  conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

(10)  is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly:

   a.  fails to provide to an individual a health care benefit or service that the organization is required to provide under the contract;

   b.  fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision; or

   c.  engages in a fraudulent activity in connection with the enrollment of an individual eligible under the Medicaid program in the organization's managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

(11)  knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

(12)  knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

QUI TAM COMPLAINT (FILED UNDER SEAL)

(13) knowingly engages in conduct that constitutes a violation under Section 32.039(b).

414. Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

415. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Texas.

416. The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

417. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct. Compliance with applicable Texas statutes was also a condition of payment of claims submitted to the State of Texas.

418. Had the State of Texas known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

419. As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

420. Defendants did not, within 30 days after they first obtained information as to such violations, furnish such information to officials of the State responsible for

QUI TAM COMPLAINT (FILED UNDER SEAL)

investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

421. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

422. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Texas:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $11,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendants caused to be presented to the state of Texas, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXIX

**(Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*)**

423. Relator realleges and incorporates by reference the prior paragraphs as

QUI TAM COMPLAINT (FILED UNDER SEAL)

though fully set forth herein.

424.    This is a *qui tam* action brought by Relator on behalf of the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*

425.    Vt. Stat. Ann. tit. 32, § 631(a) in pertinent part provides for liability for any person who:

(1)    knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

(2)    knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

(3)    knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 or section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;

(4)    knowingly present, or cause to be presented, a claim that includes items or services for which the State could not receive payment from the federal government due to the operation of 42 U.S.C. § 1396b(s) because the claim includes designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) furnished to an individual on the basis of a referral that would result in the denial of payment under 42 U.S.C. chapter 7, subchapter XVIII (the "Medicare program"), due to a violation of 42 U.S.C. § 1395nn;

\* \* \*

(9)    knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;

(10)    knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State; or

\* \* \*

(12)    conspire to commit a violation of this subsection.

426.    Defendants violated the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Vermont by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct

were even eligible for reimbursement by the government-funded healthcare programs.

427. By virtue of the acts described above, Defendants conspired to submit false claims to the State of Vermont.

428. The State of Vermont, by and through the Vermont Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

429. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Vermont in connection with Defendants' conduct. Compliance with applicable Vermont statutes and regulations was also an express condition of payment of claims submitted to the State of Vermont.

430. Had the State of Vermont known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

431. As a result of Defendants' violations of the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, the State of Vermont has been damaged in an amount far in excess of millions of dollars exclusive of interest.

432. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, on behalf of himself and the State of Vermont.

433. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid

program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Vermont:

(1) Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Vermont, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in investigating and bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXX

**(Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*)**

434.  Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

435.  This is a *qui tam* action brought by Relator on behalf of the State of Washington to recover treble damages and civil penalties under the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*

436.  RCWA 74.66.020(1) in pertinent part provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

QUI TAM COMPLAINT (FILED UNDER SEAL)

(c) Conspires to commit one or more of the violations in this subsection (1).

437.   Defendants violated the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Washington by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

438.   By virtue of the acts described above, Defendants conspired to submit false claims to the State of Washington.

439.   The State of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

440.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Washington in connection with Defendants' conduct.  Compliance with applicable Washington statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Washington.

441.   Had the State of Washington known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

442.   As a result of Defendants' violations of the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*, the State of Washington has been

damaged in an amount far in excess of millions of dollars exclusive of interest.

443. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.* on behalf of himself and the State of Washington.

444. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Washington:

(1) Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXI

**(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*)**

445. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

- 116 -

446. This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*

447. Mass. Gen. Laws Ann. Ch. 12 § 5B(a) provides liability for any person who:

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; or
>
> (3) conspires to commit a violation of this subsection; or
>
> \* \* \*
>
> (10) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment, and fails to disclose the false claim or receipt of overpayment to the commonwealth or a political subdivision by the later of:
>
> > (i) the date which is 60 days after the date on which the false claim or receipt of overpayment was identified; or
> >
> > (ii) the date any corresponding cost report is due . . . .

448. Defendants violated Mass. Gen. Laws Ann. Ch. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

449. By virtue of the acts described above, Defendants conspired to submit false claims to the Commonwealth of Massachusetts.

450. The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

451. Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was a condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct. Compliance with applicable Massachusetts statutes was also a condition of payment of claims submitted to the Commonwealth of Massachusetts.

452.  Had the Commonwealth of Massachusetts known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

453.  As a result of Defendants' violations of Mass. Gen. Laws Ann. Ch. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

454.  Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. Ch. 12 § 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

455.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the Commonwealth of Massachusetts:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the Commonwealth of Massachusetts, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

- 118 -

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Ch. 12, § 5F and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXII

**(Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)**

456.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

457.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A), which provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7; or

\* \* \*

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth.

458.    Defendants furthermore violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3(A), and knowingly caused false claims to be made, used and

presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

459. By virtue of the acts described above, Defendants conspired to submit false claims to the Commonwealth of Virginia.

460. The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

461. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' conduct. Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

462. Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

463. As a result of Defendants' violations of Virginia's Fraud Against Tax Payers Act, §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

464. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia's Fraud Against Tax Payers Act, §8.01-216.3, on behalf of himself and the

Commonwealth of Virginia.

465.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the Commonwealth of Virginia:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to VA Code Ann. § 32.1-315 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXIII

### (District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-381.02 *et seq.*)

466.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

467.    This is a *qui tam* action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-381.02 *et seq.*

468.    D.C. Code § 2-381.02(a) provides liability for any person who:

- 121 -

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Has possession, custody, or control of property or money used, or to be used, by the District and knowingly delivers, or causes to be delivered, less than all of that money or property;

(4) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the District and, intending to defraud the District, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(5) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the District who lawfully may not sell or pledge property;

(6) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District;

(7) Conspires to commit a violation of paragraph (1), (2), (3), (4), (5), or (6) of this subsection;

(8) Is a beneficiary of an inadvertent submission of a false or fraudulent claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false or fraudulent claim to the District; or

(9) Is the beneficiary of an inadvertent payment or overpayment by the District of monies not due and knowingly fails to repay the inadvertent payment or overpayment to the District.

469. Defendants violated D.C. Code § 2-381.02 and knowingly caused false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

470. By virtue of the acts described above, Defendants conspired to submit false claims to the District of Columbia.

471. The District of Columbia, by and through the District of Columbia Medicaid program and other District healthcare programs, and unaware of Defendants' illegal conduct, paid the claims submitted by healthcare providers and

QUI TAM COMPLAINT (FILED UNDER SEAL)

third party payers in connection therewith.

472. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the District of Columbia in connection with Defendants' conduct. Compliance with applicable District of Columbia statutes was also a condition of payment of claims submitted to the District of Columbia.

473. Had the District of Columbia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

474. As a result of Defendants' violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

475. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

476. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the District of Columbia:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' illegal conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the District of Columbia, except that this upper limit on liability is

subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMANDED

477.  Relator demands a jury trial.

Dated: November 5, 2018

Respectfully submitted,

**ROSMAN & GERMAIN LLP**

Daniel L. Germain (Bar No. 143334)
16311 Ventura Boulevard
Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: Germain@Lalawyer.com

*Liaison counsel for Relator*

**THE WEISER LAW FIRM, P.C.**
Christopher L. Nelson
John J. Gross
Ross M. Wolfe
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
cln@weiserlawfirm.com
jjg@weiserlawfirm.com
rmw@weiserlawfirm.com

*Attorneys for Relator*

- 124 -
QUI TAM COMPLAINT (FILED UNDER SEAL)